**In the Matter of George Clifford CULMER, G.A.D. Johnstone and John Forsyth Smith, as Joint Official Liquidators of Banco Ambrosiano Overseas Limited, pursuant to the Companies Act of the Commonwealth of the Bahama Islands, Debtor.**

**Bankruptcy No. 82 B 11808.**

United States Bankruptcy Court,
S.D. New York.

Dec. 17, 1982.

---

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for debtor; by Brian J. Gallagher and John Hartje, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for Chase Manhattan Bank, N.A.; by Norman Nelson and Sloane Elman, New York City, of counsel.

Shearman & Sterling, New York City, for J. Henry Schroder Bank & Trust Co.; by Mark P. Zimmett, New York City, of counsel.

M. William Munno, Seward & Kissel, New York City, for European Arab Bank (Middle East) E.C.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for Arab Banking Corp.; by Geoffrey D.C. Best and Abigail T. Reardon, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Ultrafin Intern. Corp.; by Naomi G. Litvin, New York City, of counsel.

White & Case, New York City, for Bankers Trust Co.; by Allan L. Gropper and Thomas J. O'Sullivan, New York City, of counsel.

Sidley & Austin, New York City, for N.V. Slavenburg's Bank; by Andrew C. Quale, Jr. and L. Gilles Sion, New York City, of counsel.

## OPINION AND ORDER FOR RELIEF UNDER 11 U.S.C. 304

BURTON R. LIFLAND, Bankruptcy Judge.

The instant proceeding arising out of a still unfolding international banking scandal affecting banking institutions both secular and religious was instituted pursuant to 11 U.S.C. Section 304 of the Bankruptcy Code. It is a proceeding ancillary to the liquidation of Banco Ambrosiano Overseas Limited ("BAOL") taking place in the Bahamas. A verified petition pursuant to Section 304 ("the 304 Petition") together with exhibits and a supporting memorandum was filed in this Court on September 8, 1982 in response to several attempts to attach BAOL assets located within this district.

## I. THE FACTS

Petitioners are the court-appointed Official Liquidators ("the Liquidators") of BAOL, a banking company which was organized and licensed under the laws of the Bahamas and was engaged in the business of banking in the Bahamian City of Nassau during the period from the receipt of its license in or about 1971 until the suspension of its banking license by the Bahamas Ministry of Finance on July 16, 1982. *See* Petitioners Trial Exhibit 1. Such suspension was ordered pursuant to the provisions of that nation's Banks and Trust Companies Regulation Act 1965 [As Amended] for the stated purpose of providing BAOL with an opportunity to restore its liquidity, which liquidity was found to have been compromised by the inability of its Italian parent, Banco Ambrosiano SPA, to support its overseas subsidiaries. *Id.* BAOL is a subsidiary of Banco Ambrosiano Holding of Luxembourg, which is, in turn, a subsidiary of Banco Ambrosiano SPA.

On August 16, 1982, pursuant to Section 129 of the Companies Act of the Bahamas (the "Companies Act"), a resolution was passed at a BAOL shareholders meeting requiring that: (i) BAOL be wound-up voluntarily; (ii) petitioners be appointed its joint liquidators; and (iii) petitioners forthwith apply to the Bahamas Supreme Court for an order providing that the voluntary liquidation of BAOL should continue under the supervision of that Court. *See* Petitioners Trial Exhibit 3. Pursuant thereto, the Governor General of the Bahamas extended the suspension order for a further 60-day period to enable BAOL to seek "certain Court approvals in connection with the orderly winding up of Banco Ambrosiano Overseas Limited under the Supervision of the Court." *See* Petitioners Trial Exhibit 2.

On August 19, 1982, in compliance with the August 16, 1982 order and resolution, petitioners sought and obtained an order directing that the voluntary liquidation of BAOL should continue but subject to the supervision of the Bahamas Supreme Court pursuant to Sections 147 and 148 of the Companies Act.

At the time of the commencement of the BAOL liquidation in the Bahamas on August 16, 1982, BAOL maintained clearing, custodial and brokerage accounts at banks and financial institutions located within the Southern District of New York.

On September 8, 1982, this Court issued an order directing all parties in interest to show cause on September 17, 1982 why the relief sought in the 304 Petition should not be granted. Petitioners were required to serve BAOL and all parties in interest by September 13, 1982. All parties in interest were directed to respond to the 304 Petition, the order show cause and the supporting memorandum by September 15, 1982.

On September 8 and 10, 1982, this Court issued a temporary restraining order enjoining and restraining, pending the September 17, 1982 hearing on the 304 Petition: (i) all parties who had commenced actions against BAOL prior to the filing of the Section 304 Petition from continuing those actions; (ii) the commencement of any action by any other BAOL depositor or creditor against BAOL, the petitioners or any BAOL property located within the Southern District of New York; and (iii) all persons from creating, perfecting or enforcing any lien, setoff or other claim against property of BAOL located within the Southern District of New York.

The 304 Petition filed by the liquidators seeks: (1) to enjoin all attaching creditors from further proceedings against BAOL assets; (2) to enjoin all others from initiating proceedings against BAOL assets; (3) to enjoin the creation, perfection and enforcement of any lien against such assets; and (4) to direct all claimants to BAOL property to return all BAOL deposits and other property which is now in their hands or which may be received by them to the Bahamas for administration in BAOL's liquidation proceeding. By September 15, 1982, the 304 Petition had been controverted by Arab Banking Corporation ("Arabank"), Bankers Trust Company ("Bankers Trust"), Bankers Trust International ("BTI"), and Chase Manhattan Bank, N.A. ("Chase").

On September 15, 1982, Ultrafin International Corporation ("Ultrafin") moved to dismiss the 304 Petition on the ground that BAOL is a bank engaged in banking business in the United States and, therefore, not eligible for such a petition under 11 U.S.C. § 109. On September 17, 1982, this Court, after a hearing, found that BAOL was not engaged in the banking business in the United States and denied Ultrafin's motion to dismiss. Thereafter, on September 24, 1982, Ultrafin filed an answer to the 304 Petition along with affidavits and a memorandum opposing the 304 Petition. At trial, Ultrafin withdrew its objection to the requested relief.

Also on September 17, 1982, after a hearing, this Court issued a preliminary injunction enjoining, *inter alia,* (1) the creation, enforcement or perfection of any lien, set off, or other claim against any BAOL asset located within this District; and (2) the commencement of any suits against BAOL, its liquidators or its property.

The 304 Petition has been fully supported by European Arab Bank (Middle East) E.C. ("European"), a $10 million creditor in BAOL's liquidation, and supported with qualifications by J. Henry Schroder Bank and Trust Company ("Schroder"), a $20 million BAOL creditor.

Only Arabank, Bankers Trust, BTI, Chase, Ultrafin, and, to some extent, Schroder, controverted the Petition. However, because N.V. Slavenburg's Bank ("Slavenburg"), a bank located in Holland, was not aware of the pendency of the 304 Petition at the time Slavenburg was required to controvert it, this Court allowed Slavenburg's objection to the 304 Petition. A trial on this matter was held pursuant to Section 304(b) on November 16, 1982.

▇ Because the procedural and substantive contours of the attenuated but elastic provisions of 11 U.S.C. Section 304 are still unchartered, a brief excursus is warranted to consider the following procedural problem: Following joinder, petitioners questioned the procedural need for an actual trial. They asserted that the issues were determinable as a matter of law. Never-

theless, exercising risk avoidance, they eschewed resort to the summary relief afforded by Rules 12 and 56 of the Federal Rules of Civil Procedure made applicable in bankruptcy by Bankruptcy Rules 712 and 756 and moved forward to trial. Pursuant to Section 304(b), the Court is free to broadly mold appropriate relief in near blank check fashion without the necessity of trial when a party in interest does not controvert the petition, or after trial if there is controversion. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 324–325 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 35 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Thus, upon the filing of an answer to the Petition, to the extent that the relief sought is within the ambit of Rule 701 of the Rules of Bankruptcy Procedure (RBP), or is intercepted by the use of Rule 914 of said Rules, the adversary rules of Part VII govern the conduct of the litigation. Even if we were to treat this litigation as if it were a debtor-contested involuntary petition, Rules 112 and 121 of RBP would still bring the litigation under the governance of the Part VII adversarial rules.

▇ It is clear, therefore, that despite the statutory language of Section 304(b) allowing relief only *after* trial, the Section 304(b) trial requirement is susceptible to avoidance by successful motion practice under Rules 712 and 756 of the RBP which Rules correlate to the summary relief of Rules 12 and 56 of the Federal Rules of Civil Procedure. It follows therefore that it will not be necessary in every instance for the curtain to ascend on a trial of a contested 304 Petition.

▇ Returning to the matter at hand, interests asserted by the objectants to this Petition to assets in this district are as follows:

(a) Prior to the stay issued in this case, Arabank, a BAOL depositor and a citizen of Manama, Bahrain, commenced an action on August 9, 1982 against BAOL in the United States District Court for the Southern District of New York for the recovery of a $2,234,577.86 time deposit which had come due on July 16, 1982. On that same day, it

obtained an *ex parte* order of attachment from Chief Judge Motley. Arabank first levied on BAOL property no later than August 11, 1982 and moved to confirm its *ex parte* attachment order no earlier than August 17, 1982. Arabank's action has been stayed pursuant to the orders of this Court and the *ex parte* attachment has yet to be procedurally confirmed.

(b) On August 15, 1972, Chase, in response to Arabank's order of attachment, purported to set off a portion of a Swiss franc obligation which was to become due from BAOL to Chase's London Branch on December 8, 1982 against the $376,739.09 balance of a BAOL account at Chase.

(c) Bankers Trust is holding approximately $1,600,000. of funds of BAOL in a general account. It also holds certain securities and notes in a separate account. Against these accounts, Bankers Trust claims it has set-off rights of at least $5,700.00 for administrative costs, interest and expenses for services rendered to BAOL.

(d) BTI, a subsidiary of Bankers Trust, asserts that it may have an unliquidated claim against BAOL for $600,000 arising from circumstances whereby certain checks were cashed with BTI in Miami, Florida which were never collected. The proceeds of these checks were allegedly deposited with BAOL.

(e) On October 18, 1982, Slavenburg purported to obtain an *ex parte* order to show cause and temporary restraining order from the Supreme Court of the State of New York, County of New York, temporarily enjoining the transfer of BAOL assets sufficient to secure a judgment for $2,157,583.33 pending the hearing of a motion for an attachment to secure its claim in that amount. No order of attachment was issued in that case. Due to the stay order of this Court issued on September 8 and 10,

and continued on September 17, 1982, Slavenburg consented to withdraw its purported temporary restraining order.

(f) Prior to the 304 Petition, on September 3, 1982, petitioner John Forsyth Smith directed Ultrafin to sell certain securities held on BAOL's account with Ultrafin and to transfer all proceeds of that sale, together with the securities remaining in that account, to the Bahamian liquidation proceeding. Ultrafin sold the specified securities, but, acting on instructions from its parent corporation, refused to transfer the cash proceeds of that sale or the remaining securities. Instead, on September 9, 1982, Ultrafin purported to begin an action against BAOL in this district for the anticipatory breach of an unmatured time deposit and obtained an *ex parte* order of attachment regarding $1.2 million of BAOL's assets in Ultrafin's possession to secure the unmatured certificates of deposit. The *ex parte* order was never procedurally confirmed. Although it subsequently asserted that these assets constituted a setoff against monies it owes BAOL, Ultrafin settled its controversy with BAOL and no longer asserts any objection to the 304 petition.[1]

On October 21, 1982, after argument, this Court issued a Memorandum and Order denying a motion by Schroder to modify the September 17, 1982 Stay Order for the purpose of permitting creditors to obtain conditional orders of attachment to be used only in the event that the 304 Petition is dismissed.

On November 5, 1982, after hearing, this Court ordered that the September 17 Stay Order be amended: (i) to require the retention, *pendite lite,* within this district of all BAOL assets present here on September 8, 1982, all assets substituted therefor, and all BAOL assets located here on November 1,

---

1. In addition, BAOL depositors, Harry Lebensfeld and Jose Fernandez obtained prepetition *ex parte* orders to show cause and temporary restraining orders temporarily enjoining the transfer of BAOL funds located in New York banks to secure claims against BAOL. Both actions were stayed pursuant to this Court's September 8 and 10, 1982 orders and no order of attachment was issued in either case. Neither Mr. Lebensfeld nor Mr. Fernandez controverted the 304 Petition despite a clear opportunity to do so and thus they will not be considered as objectants to the relief requested.

1982 as a result of Slavenburg's purported temporary restraining order; (ii) to require that all such funds be held subject to the further order of this Court in interest-bearing accounts in the name of petitioners; and (iii) to permit the petitioners to pass all other funds or property which might come into this district on to Nassau for administration under the Supervision of the Bahamas Supreme Court.

Demonstrative of the similarity of Bahamian insolvency administration, Petitioners established the following facts at trial: Since August 16, 1982, BAOL's liquidation and all of its affairs have been under the exclusive control of, and have been conducted by, the petitioners as BAOL's liquidators. Since September 3, 1982, petitioners have been subject to the supervision and control of the Bahamas Supreme Court. The liquidators, their qualifications and duties are as follows:

(a) John Forsythe Smith, a lifelong banker and the Chairman of the Royal Bank of Canada International Limited, is generally concerned with BAOL's banking and business problems.

(b) G.A.D. Johnstone, Esq., senior partner of the Nassau law firm of Higgs & Johnson, concerns himself primarily with the legal affairs of the estate.

(c) George Clifford Culmer, Chartered Accountant, a member of Mann, Judd & Co., Chartered Accountants, and the President of the Bahamas Institute of Chartered Accountants, has been most active in BAOL's accounting problems.

BAOL's Official Liquidators have retained the Nassau law firm of Callenders Orr & Co. as general counsel and attorneys to the liquidators. Prior to the liquidation, Coopers & Lybrand had been appointed as Inspector by the Central Bank of the Bahamas to conduct a special audit of BAOL's affairs. That audit has continued since August 16, 1982 and the field work was scheduled to have been completed by November 15, 1982.

Petitioners have sent proof of claim forms to each known creditor of BAOL. In order to provide more than the minimum required time for the submission and processing of claims prior to the payment of the first dividends on such claims, and pursuant to direction of the Bahamas Supreme Court, petitioners have advised all BAOL creditors that the first deadline for the submission of proofs of claim will not expire before February 1, 1983 and the examination of proofs of claim by the liquidators must be completed on or before May 31, 1983.

On October 21, 1982, pursuant to direction of the Bahamas Supreme Court and after notice to all known creditors, the petitioners conducted a meeting of creditors in Nassau to report on the progress of the liquidation to date and to consider the creation of a Creditors Advisory Committee.

One hundred and twenty (120) creditors attended the October 21, 1982 creditors meeting in Nassau. Among those creditors in attendance at the October 21, 1982 meeting were Arabank, Slavenburg's, Chase, Schroder, and European. The creditors were given a report on the affairs of the liquidation to that date and were provided with an interim report in the ongoing Coopers & Lybrand audit of BAOL's affairs as of August 16, 1982. The creditors approved the creation of the Creditors Advisory Committee.

Petitioners have also begun the process of identifying, investigating and setting aside preferential and fraudulent preliquidation transfers of BAOL assets. They have also commenced an action in the Bahamas Supreme Court against the Estate of Roberto Calvi ("Calvi"), an insider, certain companies affiliated with him, and various Bahamian banks which were thought possibly to hold funds for Calvi. In that action, petitioners have obtained an injunction against the removal of any funds from Nassau and an order for discovery of the Bahamian banks regarding assets of Calvi and his affiliated companies.

Petitioners have also spent substantial time and effort in seeking the removal of attachments and other restraints purportedly filed in Europe as well as in dealing with

those sought in this country and in the conduct of this ancillary case. BAOL's records, staff, liquidators, accountants and counsel are all in Nassau.

Although those opposed to the relief sought by petitioners attempted to impeach the foregoing indicators of regularity in BAOL's Bahamian liquidation, no such convincing evidence was introduced. This Court is satisfied that the Bahamian proceeding is inherently fair and regular.

## II. *ISSUE PRESENTED*

The issue presented, one of first impression in this Circuit, is whether this Court should in its discretion pursuant to 11 U.S.C. Section 304 grant the relief sought in the Petition of allowing the transfer of all of BAOL's assets located within the district to the Bahamas to be dispersed as part of the Bahamian liquidation of BAOL. The Petition is opposed by, *inter alia,* those who argue that the interests of American creditors should be determined under American law in this Court. For the reasons fully detailed below, it is the decision of this Court to grant the 304 Petition and defer all consideration of the proper liquidation of the BAOL estate to the ongoing BAOL liquidation proceeding in the Bahamas.

## III. DISCUSSION OF LAW

■ 11 U.S.C. Section 304 provides:

(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.[2]

(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—

(1) enjoin the commencement or continuation of—

(A) any action against—

(i) a debtor with respect to property in such foreign proceeding; or

(ii) such property; or

(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;

(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or

(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

At issue is the proper application of the factors contained in subsection (c) of Section 304 to the facts of the instant case. The legislative history of Section 304 articulates the flexibility available to a court in

---

**2.** As a preliminary matter, this Court notes that BAOL is the subject of a "foreign proceeding" within the meaning of 11 U.S.C. Section 101(19) and, therefore, is a proper subject of a 304 petition. That foreign proceeding is the winding up of BAOL under the supervision of the Bahamas Supreme Court pursuant to Part IV of the Bahamas Companies Act and the Companies (Winding-Up) Rules ("the Winding-Up Rules). Petitioners Culmer, Johnstone and Smith are the "foreign representatives" of BAOL within the meaning of 11 U.S.C. Section 101(20) and, therefore, Section 304.

applying these factors to the specific circumstances in each case in order to arrive at a fair result. It describes the 304(c) factors as:

"[G]uidelines ... designed to give the court maximum flexibility in handling ancillary cases. Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.[3] "

Those who have controverted the 304 Petition or objected to it at trial assert that the interests contained in Section 304(c)(2)—"protection of all claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding"—would be afforded no weight if this Court exercises its flexibility and grants the relief requested. See, e.g., Transcript at 196–200, 204–206, Memorandum of Arabank in Opposition to Petition ("Arabank Brief") at 17–20; Prehearing Memorandum of Bankers Trust and BTI ("Bankers Trust and BTI Brief") at 7–15.

In addition, Arabank, Bankers Trust and BTI have unsuccessfully attempted to cast doubt on the ability of the Bahamian liquidation proceeding to ensure just treatment of holders of claims, prevent preferential or fraudulent dispositions of property as well as distribute the proceeds of the estate substantially in accordance with the order prescribed by this title. See Section 304(c)(1)(3) and (4). However, these creditors have submitted no concrete evidence of any wrongdoing or propensity for wrongdoing on the part of the liquidators based upon an alleged loyalty to Banco Ambrosiano SPA of Italy. Counsel for Bankers Trust, BTI, and Arabank attempted to discredit the liquidation described by petitioners' witnesses at trial and merely speculated

in their own proffers of testimony and in their briefs along these lines. However, no concrete facts were ever elicited tending to impugn the impartiality of the liquidators or the regularity with which the Bahamian liquidation is proceeding. See Transcript at 26–35, 113–114, 127, 178; Arabank Brief and Bankers Trust and BTI Brief.

It is this Court's opinion based upon the wording and legislative history of Section 304 that the central examination which it must undertake in order to comply with Section 304(c) is whether the relief petitioners seek will afford equality of distribution of the available assets. The Second Circuit has enunciated the importance of this principle in bankruptcy proceedings, stating:

"The theme of the Bankruptcy Act is equality of distribution of assets among creditors, ... and correlatively avoidance of preference to some. ... The road to equity is not a race course for the swiftest." *Israel British Bank (London), Ltd. v. Federal Deposit Insurance Corp.*, 536 F.2d 509, 513 (2d Cir.), *cert. denied sub nom. Bank of the Commonwealth v. Israel British Bank (London) Ltd.*, 429 U.S. 978, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976).

BAOL's Bahamian liquidation comports with both Section 304(c) and the principle of equality of distribution. It is the Bahamas Supreme Court that can "best assure an economical and expeditious administration of [the BAOL] estate." 11 U.S.C. § 304(c). BAOL's records and preliquidation employees are in the Bahamas. The liquidators and their staff are in Nassau and are bound to comply with the laws of the Bahamas and the orders of the Bahamas Supreme Court. The Bahamian court can most efficiently deal with all of BAOL's creditors, both American and worldwide.

Moreover, the Bahamas has by far the greatest interest in BAOL's liquidation since neither the United States nor the

---

**3.** H.R. No. 95–595, 95th Cong. 1st Sess. 324–325 (1977), S.Rep. No. 95–989, 95th Cong., 2nd Sess. (1978) 35, U.S.Code Cong. & Admin.News 1978, p. 5821. This Court has found no reported cases ruling on the ultimate question of whether to grant the relief requested in a 304 Petition. In the two bankruptcy court cases cited

by BTI and Bankers Trust in their trial brief, *In re Lineas Areas de Nicaragua, S.A.,* 13 B.R. 779 (Bkrtcy.S.D.Fla.1981) and *In re Egeria Societa per Azioni di Navigazione,* 20 B.R. 625, (Bkrtcy. E.D.Va.1982), the courts appear to have ruled on requests for preliminary relief.

State of New York has any governmental or public interest in BAOL's liquidation. Indeed, two of BAOL's major creditors, European and Schroder, have supported the Bahamian liquidation. Each of these two creditors holds a claim greater than the aggregate of all of the claims of those controverting the 304 Petition. In contrast, only a handful of creditors who have purported to obtain preferences in this district have opposed transferring all of BAOL's assets for distribution in the Bahamian liquidation. To allow these opposing creditors to preclude the relief requested would grant them preferences to which they are not entitled either in a Bahamian liquidation, *see* Companies Act §§ 153, 164, Petition ¶ 11(d), or in a United States bankruptcy, *see, e.g.,* 11 U.S.C. § 547. This Court is thus not obliged to protect the positions of fast-moving American and foreign attachment creditors over the policy favoring uniform administration in a foreign court. *See Banque de Financement, S.A. v. First National Bank of Boston,* 568 F.2d 911, 921 (2d Cir.1977).

All of the factors listed in Section 304(c) have historically been considered within a court's determination whether to afford comity to a proceeding in a foreign nation. Comity has historically been defined as:

[T]he recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws. *Hilton v. Guyot,* 159 U.S. 113, 164 [16 S.Ct. 139, 143, 40 L.Ed. 95] (1895).

■ Comity is to be accorded a decision of a foreign court as long as that court is of competent jurisdiction and as long as the laws and public policy of the forum state are not violated. *See Hilton v. Guyot, supra* 159 U.S. at 202–03, 16 S.Ct. at 158–159; *Clarkson Co. v. Shaheen,* 544 F.2d 624, 629 (2d Cir.1976); *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (S.D.N.Y.1979); *SNR Holdings Inc. v. Ataka America, Inc.,* 54 A.D.2d 406, 408, 388 N.Y.

S.2d 909, 911 (1st Dept.1976). Courts in New York have even more narrowly construed the exceptions to the comity doctrine, declaring:

"[F]oreign-based rights should be enforced unless the judicial enforcement of such a [right] would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense." *Cornfeld, supra* (quoting *Intercontinental Hotels Corp. v. Golden,* 15 N.Y.2d 9, 13, 254 N.Y.S.2d 527, 529, 203 N.E.2d 210, 212 (1964)). *Accord, Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198, 202 (1918).

Thus, this Court will look to the other relevant factors enumerated in Section 304(c) to determine whether the evidence presented as to Bahamian law indicates that its application therein would be wicked, immoral, or violate American law and public policy.

An examination of the provisions of Bahamian law related to liquidation proceedings reveals that they are in substantial conformity with our own law. BAOL's liquidation complies with § 304(c)(1) in that the Bahamian Companies Act, like our own bankruptcy laws, provides a comprehensive procedure for the orderly and equitable distribution of BAOL's assets among all of its creditors. For example:

(a) The Bahamian Winding-Up proceeding is fully supervised by the Bahamas Supreme Court, and the liquidators are required to report to the court and the creditors semi-annually and, in the end, must account to the court for their stewardship. Winding-Up Rules 88, 89. *Compare, e.g.,* 11 U.S.C. § 704. (However, in this case, the Bahamas Supreme Court has directed petitioners to report to the Court and creditors on a quarterly basis.)

(b) The winding-up order in a Bahamian liquidation forbids creditors to sue the debtor except with the prior consent of the court, and limits them to claims in the liquidation. Companies Act § 87. *Compare, e.g.,* 11 U.S.C. § 362.

**630**

(c) All transfers, attachments, executions and the like effected after the commencement of the liquidation are deemed void. Companies Act §§ 153, 164.

(d) Preferences and fraudulent conveyances are subject to avoidance. Companies Act § 165. *Compare, e.g.,* 11 U.S.C. §§ 547–48.

(e) Liquidators cannot make any payment to an individual creditor or to any class of creditors without the Bahamian court's prior approval. Companies Act § 160.

(f) No preference is given to the claims of Bahamian citizens. *See* Companies Act and Winding-Up Rules *passim.*

As noted *supra,* during the cross-examination of counsel for the liquidators, BTI, Arabank and Slavenburg unsuccessfully attempted to have Mr. Callender indicate that the application of Bahamian law would allow preferential treatment to be afforded to Bahamian domestic creditors in a Bahamian liquidation. *See* Transcript at 127–158. However, none of the objectants submitted any convincing evidence of any meaningful divergence between American and Bahamian liquidation law in either application or substance.

In fact, all of the evidence submitted indicates that BAOL's Bahamian liquidation proceeding fully satisfies the criteria of 11 U.S.C. § 304(c)(2). All claim holders in the United States will be adequately protected against prejudice and inconvenience in the processing of their claims in the Bahamian liquidation proceeding. Bahamian law and procedure so provides. For example:

(a) Adequate notice of the Bahamian proceeding is required. Winding-up Rule 60.

(b) The liquidators are required to report the status of the liquidation to the court and the creditors on a quarterly basis. Trial Exhibit 4, Order of the Bahamas Supreme Court dated September 6, 1982.

(c) Each creditor may prove his claim by affidavit which may be submitted by mail unless the Bahamas Supreme Court directs that any creditor or class of creditors may have his, its or their claim or claims admitted without proof. Winding-Up Rules 50–59.

(d) There is no absolute time limit within which a creditor must file a claim. But, from time to time, the liquidators may establish deadlines for filing proofs of claim. At least twenty-eight (28) days notice of each such deadline must be given by advertisement and by written notice mailed to each person who has not yet filed a proof of claim but is believed to be a creditor. Winding-Up Rule 60. (However, in this case creditors have been given over three months to submit claims and an additional four-month period has been reserved for processing claims prior to the payment of an initial dividend.)

(e) Each creditor whose claim is rejected must receive from the liquidators a written statement of the grounds for the rejection. Winding-Up Rule 61.

(f) A creditor whose claim is rejected can appeal to the Bahamas Supreme Court which will decide the validity of the claim *de novo.* Winding-Up Rules 62, 63, 64. Within three days of receiving an appeal, the liquidators must file with the Court the rejected proof of claim and a memorandum stating the reasons for rejection. Winding-Up Rule 66.

(g) All of BAOL's creditors which have controverted the Petition in this Section 304 proceeding have substantial claims against BAOL. The cost of processing their claims in the Bahamas is *de minimis* in comparison to the amount of their claims.

Furthermore, BAOL's Bahamian liquidation satisfies 11 U.S.C. § 304(c)(3) in that preferential or fraudulent dispositions of BAOL's assets are prohibited. *See* Companies Act, § 165. However, to allow BAOL's creditors appearing in this 304 proceeding to continue their actions here might indeed result in preferential treatment of those creditors.

Relief is also proper under Section 304(c)(4) in that the distribution of BAOL's estate in the Bahamas will be substantially in accord with the order and priorities pre-

scribed by Title 11 of the United States Code. BAOL's assets will be disbursed according to statutory prescription: taxes, wages and administrative costs are paid on a preferential basis; secured claims are paid according to their priorities; unsecured creditors are paid *pro rata;* and compositions with classes of creditors and compromises with individual creditors require court approval. Companies Act §§ 159–61; Winding-Up Rules 91–98. *Compare, e.g.,* 11 U.S.C. §§ 507, 726.

Based upon the presentation by the litigants herein of the Bahamian liquidation laws and their impact upon all of the factors enumerated in 304(c),[4] this Court finds that affording comity would not violate American law or public policy. Whether or not Bahamian law is identical in application to American law, there is nothing inherently vicious, wicked, immoral or shocking to the prevailing American moral sense in the Bahamian laws outlined above. *See Cornfeld, supra* and cases cited therein. Indeed, it has been shown that these Bahamian laws are not repugnant to our ideas of justice.

In addition, the Court in *Cornfeld* noted that it is well-settled that the liquidation laws of Canada, which are virtually the same as those of the Bahamas, are to be given effect under principles of comity. *See Cornfeld, supra,* 471 F.Supp. at 1259 (citing *International Firearms Co. v. Kingston Trust Co.,* 6 N.Y.2d 406, 411, 189 N.Y. S.2d 911, 913, 160 N.E.2d 656, 658 (1959)). The court in *Cornfeld* noted that Canada, like the Bahamas, is "a sister common law

jurisdiction with procedures akin to our own." *Id.,* (quoting *Clarkson Co. v. Shaheen, supra,* 544 F.2d at 630). Accordingly, the court in *Cornfeld* went on to hold that recognition of the Canadian proceeding did not violate the laws or public policy of the United States, and would actually promote American public policy, it being "the firm policy of American courts [to stay] actions against a corporation which is the subject of a bankruptcy proceeding in another jurisdiction." *Cornfeld, supra* at 1259.[5]

That which was articulated by the court in *Cornfeld* regarding the substantial similarity between American and Canadian bankruptcy laws may equally be said of the similarity between American and Bahamian bankruptcy law. This is because the English Companies Act forms the basis for both the Canadian and Bahamian liquidation rules.

The court in *Cornfeld* stated that its decision to defer to the foreign proceeding was supported by *Canada Southern Railway v. Gebhard,* 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883). *Accord, Kenner Products Co. v. Societe Fonciere et Financiere,* 532 F.Supp. 478 (S.D.N.Y.1982). This Court similarly finds its holding mandated by both *Cornfeld* and *Gebhard.*

In *Gebhard,* New York plaintiffs brought an action in New York to recover on the bonds of a Canadian railroad company which was undergoing reorganization in Canada. The Supreme Court held that the New York action was barred and that these

4. The fresh start factor within Section 304(c)(6) by its terms relates to individual debtors and thus has no application herein.

5. The facts in *Cornfeld* are quite similar to those in the instant case. Investors Overseas Services, Ltd. (IOS), a Canadian corporation, was undergoing liquidation under Canadian bankruptcy law. Cornfeld sought to invoke the jurisdiction of the New York court to attach certain assets of IOS located in this district, asserting that as a citizen of New York, his rights would be prejudiced in the Canadian proceeding. The court in *Cornfeld* held that the Canadian winding up procedures are jurisdictionally sound and consistent with American bankruptcy policy and practices. It declared:

Section 21 of the Canadian statute and Section 11a and Rule 401(a) of the American Bankruptcy laws are intended to ensure that the assets of a bankrupt are efficiently and fairly distributed among its creditors in a single proceeding instead of erratically being dissipated in a number of different law suits. *Cornfeld, supra* at 1260.

It is also noteworthy that in reaching its conclusion to defer to the Canadian court, the *Cornfeld* court, considered the passage of Section 304 as an expression of the importance of principles of international comity. *See Cornfeld, supra* at 1260, 1262.

New York bondholders were bound by the Canadian reorganization. In so holding, the *Gebhard* court noted that the Canadian reorganization plan

"is in entire harmony with the spirit of the bankruptcy laws, the binding force of which, upon those who are subject to the jurisdiction, is recognized by all civilized nations.... Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries." *Gebhard, supra,* 109 U.S. at 539, 3 S.Ct. at 371.

As in the *Gebhard* case, the liquidation laws of the Bahamas are in harmony with those of the United States and must be afforded comity. The claims by Arabank, Bankers Trust, BTI and Chase that they are exempted from the Bahamian Winding-Up Rules and regulations simply because they are American creditors with possible preferences over other creditors in a New York forum must be rejected. This result is altogether just and appropriate as these creditors dealt freely with BAOL and were undoubtedly aware that they were dealing with a bank incorporated under and subject to foreign law when they first began doing business with BAOL. Now, BAOL, like Canada Southern cannot repay these creditors except as permitted in the liquidation proceedings designed by the governing sovereign for that purpose. As the Court in *Gebhard* declared:

"[E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy, which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony. It follows, therefore, that anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere."

*Gebhard, supra,* 109 U.S. at 537–38, 3 S.Ct. at 370.

■ Thus, like the Canadian Southern bondholders, the BAOL's creditors' rights are subject to foreign laws and every BAOL creditor must be required to pursue its remedies in the Bahamian liquidation. One who invests in a foreign corporation subjects his investment to foreign law and may not seek to obtain greater rights than his co-creditors by suing in an American court.

■ Moreover, Section 304 does not require an American administration of assets of a foreign debtor located in this country simply because creditors appearing in the United States request such relief. *See Matter of People of the State of New York (Norske Lloyd Insurance Co.),* 242 N.Y. 148, 164, 151 N.E. 159 (1926). The *Norske* case bears a striking similarity to the instant case. *Norske* involved the distribution of assets of an insolvent foreign insurance company in the possession of the Superintendent of Insurance. A primary receiver was appointed in Norway when the company became insolvent. This company had deposited securities with the Superintendent pursuant to local law. The Superintendent allocated the claims to three general classes, as follows:

1. policies issued to United States Citizens by agencies of the company doing business in this country;

2. policies issued by the company outside the country to persons residing within the country; and

3. policies issued to nonresidents of this country by foreign agencies of the company.

The issue decided by the Court in *Norske* was whether the surplus of assets after full payment to claimants from class number one above should be distributed first to domestic creditors or turned over to the primary receiver for general distribution.

The Court in *Norske* held that there is no principle of equity, comity or public policy which authorizes the application of funds in the hands of the Superintendent of Insurance to payment in full of *local creditors before transmission to the receiver for general distribution. Norske,* 242 N.Y. at 163, 151 N.E. 159 (emphasis supplied). The New York State Court of Appeals reasoned that the ordinary rule of distribution of the assets of an insolvent is equality among creditors of the same class and this rule requires transmission of this surplus after full payment to the first class from the ancillary receiver to the primary receiver for distribution *pro rata* among the insurance company's creditors. *Id.,* 242 N.Y. at 164, 151 N.E. 159.

In addition, Section 304 does not create a full case for administration, *see* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 324–325 (1977), and it has always been contemplated that United States ancillary proceedings might be used by foreign liquidators to avoid American preferences and protect assets for foreign administration. *See Banque de Financement v. First National Bank of Boston,* 568 F.2d 911 (2d Cir.1977).

It is abundantly clear that the principle of comity is to be exercised in the instant case. Analysis of this principle has traditionally favored its regular application unless egregiously unjust consequences would flow from its implementation. That which was said by one commentator is as true today as when he articulated it in 1888:

"It is obvious that, in the present state of commerce and of communication, it would be better in nine cases out of ten that all settlements of insolvent debtors with their creditors should be made in a single place, better for the creditors, who would thus share alike and better for the debtor because all his creditors would be equally bound by his discharge."

Lowell, John, *Conflict of Laws as Applied to Assignments for Creditors,* 1 Harv.L.Rev. 258, 264 (1888).

Those objecting to the 304 Petition have merely noted various areas of possible unfairness in their briefs and other submissions to this Court. These objectants have proven no unfairness in BAOL's Bahamian liquidation, *i.e.,* that foreign creditors will fare better, that BAOL's liquidators are biased, or that the liquidators have any undue loyalty to any of BAOL's creditors. Nor have the objectants proven that the Petitioners will not diligently pursue a quest for assets and claims of the defunct bank, or that there has been or will be any irregularity in the expeditious processing of claims in the Bahamas. Indeed, petitioners have submitted evidence directly contradicting these bare assertions and attesting to the regularity and fairness of these Bahamian proceedings. *See* Transcript of testimony of Mr. Smith at 26–37 and of Mr. Callender at 110–119 and Trial Exhibits 5–11. Nor have any of the objectants proven any serious prejudice or even inconvenience in pursuing their claims in the Bahamas. The only concrete evidence submitted is that the bank of one of the liquidators is on the BAOL liquidation advisory committee. *See* Transcript at 63. This fact without more is insufficient to taint those proceedings which are closely supervised by the Court.

■ Because the record is devoid of any evidence of prejudice and the legal requirements for affording comity to the BAOL Bahamian proceeding have been satisfied according to Section 304 of the Code, I grant the Petition in full.[6] Therefore, in accordance with the Petition, it is hereby

---

6. Because this Court has granted the relief requested in the Petition, it is unnecessary to deal

with the objections raised by the petitioners to

ORDERED, ADJUDGED and DECREED that: this Petition for ancillary relief under Section 304 is granted; and, during the pendency of the proceedings in *In the Matter of Banco Ambrosiano Overseas Limited (in Liquidation),* Supreme Court, Commonwealth of the Bahamas, Equity Side, 1982, Case No. 639:

(a) all persons and entities are hereby enjoined from creating, obtaining, perfecting, or enforcing any setoff, restraint, lien attachment, or judgment against any asset of Banco Ambrosiano Overseas Limited (in Liquidation) or any asset of any of its Official Liquidators, as such, which is now located within the Southern District of New York or which hereafter may be found within this District, without the prior order of the Bahamas Supreme Court;

(b) all persons and entities are hereby enjoined from commencing or prosecuting any other action against or affecting any asset of Banco Ambrosiano Overseas Limited (in Liquidation) or any asset of its Official Liquidators, as such, which is now located in this District or which hereafter may be found within this District, without the prior order of the Bahamas Supreme Court; and

(c) all persons and entities located within the Southern District of New York which now have or may hereafter obtain any funds or assets belonging to Banco Ambrosiano Overseas Limited (in Liquidation) or to its Official Liquidators, as such, shall forthwith turn over all such funds and assets to the petitioners for administration under the supervision of the Bahamas Supreme Court, except that pursuant to petitioners concessions, Bankers Trust Company may retain the sum of $5,700.00 and Chase Manhattan Bank N.A. may retain the sum of $376,739.09, both pending determination

the validity of the attachments obtained by Arabank and Ultrafin. In any event, Ultrafin withdrew its objection to the Petition on the day the trial commenced. Such objections may be raised and fully considered in the Bahamian liquidation if these attachments are pursued in that proceeding. Similarly, the validity of the claims of setoff asserted by Chase and Bankers Trust as well as BTI's unliquidated claim for $600,000 should properly be determined in the

by the Supreme Court of the Commonwealth of Bahama Islands of their respective rights under Bahamian law to set these sums off against debts owed to them by Banco Ambrosiano Overseas Limited, (in Liquidation) (see footnote 6 above); and

IT IS FURTHER ORDERED, that this Court shall retain jurisdiction over the subject matter of this action for the purpose of enforcing this judgment.

The foregoing constitutes this Court's order of relief in accordance with 11 U.S.C. Section 304.

Bahamian liquidation. However, the petitioners conceded at the initial hearing that Chase could continue to hold the funds it would set off against its prepetition claim in the Bahamian liquidation. It follows logically therefore, that Bankers Trust Company is entitled to continue to retain the sum of $5,700.00 applicable to the funds it would set off against its prepetition claim in the Bahamian liquidation.