**In re Petition of David ROSE, as Director of the Legal Entity Closedown Project for Aviva plc on behalf of London and Scottish Assurance Corporation, Ltd., Edinburgh Assurance Company Limited, The Indemnity Marine Assurance Company Limited, The British & European Reinsurance Company Limited, Commercial Union Assurance Company Limited, General Accident Fire and Life Assurance Corporation Limited, General Accident Reinsurance Company Limited, The New England Reinsurance Company (UK) Limited, The Road Transport & General Insurance Company Limited, The Ulster Marine Insurance Company Limited, Scottish Insurance Corporation Limited, The Yorkshire Insurance Company Limited and The Ocean Marine Insurance Company Limited, Filing Petitioners.**

No. 04–11829 (PCB).

United States Bankruptcy Court, S.D. New York.

Dec. 29, 2004.

LeBoeuf, Lamb, Greene & MacRae L.L.P., New York City, by Peter A. Ivanick, Lynn W. Roberts, for Petitioner and Foreign Representative.

## MEMORANDUM DECISION DENYING PERMANENT INJUNCTION

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

This case tests the limits of the "near blank check" flexibility a bankruptcy court has to fashion relief in a case under § 304 of the Bankruptcy Code.[1] At issue is whether solvent foreign corporations may obtain nationwide permanent injunctions from this court in order to effectuate a corporate, administrative and financial restructuring unrelated to any foreign insolvency proceeding. For the reasons set forth below the court denies the request as exceeding the scope of the § 304 of the Bankruptcy Code.

## PROCEDURAL HISTORY

On March 18, 2004, David R. Rose, in his capacity as the Director of the Legal Entity Closedown Project for Aviva plc ("Mr. Rose") filed a verified petition on behalf of 13 British insurance and reinsurance companies (the "Corporations"). The petition seeks permanent relief in aid of a proceeding under Part VII of the United Kingdom Financial Services and Markets

---

1. *In re Culmer*, 25 B.R. 621, 624 (Bankr. S.D.N.Y.1982); *In re Carolina Reinsurance*, 281 B.R. 224, 228 (Bankr.S.D.N.Y.2002).

Act 2000 ("FSMA")[2] in the High Court of Justice in England (the "High Court") in connection with the approval of a Transfer Scheme (the "Transfer Scheme") to which each of the Corporations is a party. The Transfer Scheme proposes to effect a corporate restructuring by shifting the majority of assets and liabilities of twelve of the Corporations into the thirteenth Corporation. Mr. Rose seeks permanent injunctive relief to prevent collateral attack on the Transfer Scheme in the United States.[3]

On May 12, 2004 the High Court issued a final order (the "UK Final Order") sanctioning the Transfer Scheme and incorporating the Transfer Scheme in its terms. The UK sanctioned Transfer Scheme is to become effective on December 30, 2004 or such earlier date as the High Court may approve.

## BACKGROUND [4]

The Corporations are all either direct or indirect subsidiaries of CGUII plc, itself an indirect subsidiary of The Aviva Group, which is comprised of over 800 corporations. Each of the Corporations wrote a wide variety of general and reinsurance in the London subscription market. Although all have ceased writing new business, each of the Corporations continues to be regulated by the FSA while it continues in the business of running off policy liabilities. Three of the Corporations, Yorkshire, Indemnity Marine and Ocean Marine, are authorized surplus lines insurers in the United States and are subject to regulations requiring the maintenance of trust funds with United States banks.

The Corporations are all solvent. The Transfer Scheme effects a restructuring of their businesses and their balance sheets in order to consolidate their administration of policies. The Transfer Scheme proposes to restructure the Corporations by transferring the general insurance liabilities of twelve Corporations to Ocean Marine as well as by transferring to Ocean Marine (1) the Corporations' rights in respect of all reinsurance coverage relating to the transferred liabilities and (2) a deed of mutual guarantee (the "DMG") to which each of the UK regulated insurance companies within the CGUII group are party. The transferor Corporations would, however, still retain assets after the transfer.

If these transfers occur, the United States regulations requiring Yorkshire and Indemnity Marine to maintain trust funds in this country would no longer apply and Yorkshire and Indemnity Marine would be able to reclaim a legal interest in those trusts aggregating approximately $12 million. The $12 million would remain available to the parties to the DMG, including Ocean Marine, which would continue to

---

**2.** Part VII of FSMA is not a bankruptcy law. Rather, it contains the provisions of UK law that permit the transfer of portfolios of insurance business as a matter of law without the need for policy by-policy decisions. The FSMA is the UK statute through which the UK regulatory authority, the Financial Services Authority (the "FSA") monitors the UK financial services market.

**3.** After a hearing, this court issued temporary injunctive relief on March 19, 2004 and continued that injunction on March 25, 2004. On June 4, 2004, Mr. Rose and Ms. Pollyanna Deane, a British solicitor retained by Mr. Rose, testified before this Court in support of the verified petition.

**4.** The court has made additional findings of fact based on the Post–Hearing Memorandum of Law filed by Mr. Rose in support of his injunction request. These additional findings of fact are attached to this memorandum decision as Exhibit A and are incorporated herein by reference. The court has adopted these findings based on the testimony of both Mr. Rose and Ms. Deane at the court's hearings on this motion. The Post–Hearing Memorandum may be found at document 26 on the case docket.

maintain a trust fund in the United States sufficient to satisfy United States regulatory requirements. Ultimately, Mr. Rose states that the transferor Corporations would be deregulated and later, liquidated.

### DISCUSSION

■ Bankruptcy Code ("Code") § 304 was enacted as part of the Bankruptcy Reform Act of 1978 and was intended by Congress to provide a mechanism for the recognition and enforcement in the United States of foreign insolvency proceedings. *In re Multicanal, S.A.,* 314 B.R. 486 (Bankr.S.D.N.Y.2004); *In re Carolina Reinsurance Ltd.,* 281 B.R. 224, 227 (Bankr. S.D.N.Y.2002).

■ Code § 304(a) provides that "a case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative."[5] Code § 101(23) defines a "foreign proceeding" as a "proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceedings, for the purpose of liquidating an estate, adjusting debts by composition, extension or discharge, or effecting a reorganization." Because the term "reorganization" is not specifically defined in the Code, Mr. Rose argues that the term has only one meaning and that *any* type of corporate restructuring within *any* type of foreign proceeding falls within the parameters of Code § 304.

The great Lewis Carroll had the following to say about the meaning of words—

*"When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."*

*"The question is," said Alice, "whether you can make words mean so many different things."*

*"The question is," said Humpty Dumpty, "which is to be master—that's all."— Through the Looking Glass (And What Alice Found There) by Lewis Carroll*

■ This court disagrees with Mr. Rose's characterization of the meaning to be ascribed to the term "reorganization." It is true that the Code does not specifically define that word. When interpreting a statute, however, the court must first look to the plain meaning of the particular statutory language at issue, as well as the language and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). The meaning of a particular section in a statute should be understood in context with and by reference to the whole statute, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole"). The Court must also review the statute pursuant to the reasonable interpretation "mandated by its grammatical structure." *United States v. Ron Pair Enterprises,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

---

**5.** Since the court finds that this matter does not qualify as a foreign proceeding, the court need not determine whether Mr. Rose is a qualified foreign representative under Code § 101(24).

In this instance, the court finds that Mr. Rose's attempt to isolate the word "reorganization" from the words "liquidation," "adjusting debts" and "discharge" does not reflect the statute's intent, which indicates that a "reorganization" under this section should have characteristics of proceedings of the type that the adjectives immediately preceding that word have, as well as have characteristics of proceedings of the type described elsewhere in the Code, such as a Chapter 11 reorganization.[6] As the first two sentences of the statute's legislative history provides, "[t]his section governs cases filed in the bankruptcy courts that are ancillary to foreign proceedings. That is, *where a foreign bankruptcy case is pending* concerning a particular debtor and that debtor has assets in this country, the foreign representative may file a petition under this section * * *." H. Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st sess. (1977) p. 324, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6281 (emphasis added).

Moreover, the term "corporate reorganization" does not just have one meaning as Mr. Rose suggests. The term is used extensively in the corporate world. "Reorganization is a general term describing corporate amalgamations or readjustments. Under some corporation laws, a corporate reorganization may include a statutory merger or consolidation, an exchange of voting shares, a spin-off of assets from one corporation to a new corporation, the sale of a subsidiary, a recapitalization, or a change of identity or place of organization." 19 Am.Jur.2d Corporations § 2171 (October 2004). The reorganization of a corporation in bankruptcy, however, is a different concept. As "commonly understood, [it] is distinguishable from a consolidation or merger. It is not ordinarily the combination of existing corporations, but is simply the completion by proper agreements and legal proceedings, of a business plan or scheme for winding up the affairs of, or foreclosing mortgages upon the property of insolvent corporations, and the organization of a new corporation to take over the property and business of the distressed one." *Id.*

■ Mr. Rose has also urged that solvent entities may obtain relief under Code § 304. As to the solvency issue, the court does not disagree. It has long been the case that solvent debtors may file bankruptcy cases and voluntarily surrender their assets. *In re Century/ML Cable Venture,* 294 B.R. 9 (Bankr.S.D.N.Y.2003); *In re Texaco, Inc.,* 84 B.R. 893 (Bankr. S.D.N.Y.1988); *see also, In re Liberate Technologies,* 314 B.R. 206 (Bankr. N.D.Cal.2004); *In re Horan,* 304 B.R. 42 (Bankr.D.Conn.2004); *In re Marshall,* 300 B.R. 507 (Bankr.C.D.Cal.2003); *In re Central Jersey Airport Services,* 282 B.R. 176 (Bankr.D.N.J.2002). Thus, it is not the solvency of the Corporations that gives this court pause.

Finally, Mr. Rose argues that all of the criteria set forth in Code § 304(c) have been met.[7] Whether that is true or not is

---

6. While Code § 101(23) includes a comma after the word "discharge" the Court finds that it is merely intended to separate clauses in a series. The Court finds nothing about the sentence structure to give it any other consideration. *See Chicago Manual of Style,* 14th Edition, Chicago: University of Chicago Press, 1993, Chapter 5.5 (in a series consisting of three or more elements, the elements are separated by commas. When a conjunction joins the last two elements in a series, a comma is used before the conjunction).

7. Code § 304(c) provides:

In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an

an inquiry that the court finds unnecessary. Because the court determines that this matter is not a foreign proceeding under Code § 304(a), the court must dismiss the Petition, even if Mr. Rose can satisfy every element of § 304(c).

The court understands that this is the only court with the authority to issue a United States nationwide injunction. It is unfortunate that Mr. Rose is uncertain of the effect of the UK Final Order in the United States.[8] However when all is said and done, Mr. Rose is asking the court to do what it cannot—to enter an order allowing him to use the bankruptcy law to enjoin potential lawsuits in the United States so he can effect a corporate financial restructuring of a group of foreign insurance companies unrelated to any foreign insolvency proceeding. This court does not have the authority to enter any order, no matter what the ramifications to the Corporations, which exceeds the scope and jurisdiction of the statute that it is interpreting.

For the reasons set forth above, the Mr. Rose's motion is denied and the Petition is dismissed.

So Ordered.

economical and expeditious administration of such estate, consistent with—
    (1) just treatment of all holders of claims against or interests in such estate;
    (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
    (3) prevention of preferential or fraudulent dispositions of property of such estate;
    (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
    (5) comity; and
    (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

## EXHIBIT A

The following Findings of Fact have been drawn from the Post–Hearing Memorandum of Law filed by Mr. Rose. The court adopts these Findings, with some editing by the court, based on the trial testimony of Mr. Rose and Ms. Deane, which the court found credible and factually correct.[1]

The Aviva Group, which is comprised of over 800 corporations, includes as direct and indirect subsidiaries of CGUII plc (itself an indirect subsidiary of Aviva plc), the thirteen Corporations, each of which wrote a wide variety of general insurance and reinsurance in the London subscription market. Although all have ceased writing new business, each of the Corporations continues to be regulated by the FSA while it continues in the business of running off policy liabilities.[2] Three of the Corporations, Ocean Marine, Yorkshire and Indemnity Marine, which are authorized surplus lines insurers in the United States, have surplus line liabilities to United States policy holders and are, therefore, subject to regulations requiring the maintenance of trust funds with United States banks.

8.  Mr. Rose has advised this court that it is unlikely that the Transfer Scheme will go forward without an order from this court.

1.  *See* case docket document number 26.

2.  Part VII of FSMA contains the provisions of UK law that permit the transfer of portfolios of insurance business without the need for policy by-policy novations. The FSMA is the UK statute through which the UK regulatory authority, the Financial Services Authority (the "FSA") monitors the UK financial services market and which serves the FSA's four main objectives: maintaining market confidence; promoting public understanding of the financial system; the protection of consumers; and fighting crime.

The Corporations are all solvent. The Transfer Scheme proposes to effect a restructuring of their businesses and balance sheets in order to resolve administrative, financial and regulatory matters. All of the Corporations' general insurance business that was written in the London subscription market is now, and has been since 2000 (when the reinsurance premium was fully paid), reinsured through National Indemnity Company ("NICO"), which is obligated to cover the CGUII group's general insurance liabilities to the extent of 2.2 billion British pounds. All of the transferor Corporations' business is reinsured by NICO, as is Ocean Marine's business. If the Transfer Scheme becomes effective, Mr. Rose has stated that the transferor Corporations would be deregulated and, ultimately, liquidated.

The Transfer Scheme proposes to restructure the Corporations' businesses and balance sheets by transferring the twelve transferor Corporations' general insurance liabilities to Ocean Marine. It also proposes to transfer to Ocean Marine the transferor Corporations' rights in respect of (1) all reinsurance coverage relating to the transferred liabilities, including the NICO reinsurance, and (2) a deed of mutual guarantee (the "DMG") to which each of the UK regulated general insurance companies within the CGUII corporate group are a party.

As a result of these transfers, Mr. Rose states that the conditions of the United States regulations requiring Yorkshire and Indemnity Marine to maintain trust funds in this country will no longer apply and pursuant to the Trust deeds establishing those trusts, Yorkshire and Indemnity Marine would be able to reclaim a legal interest in a combined total of approximately $12 million. Mr. Rose states that while the funds that currently comprise these trusts would initially be released to Yorkshire and Indemnity Marine, these funds could be transferred (for value) to CUGII and its direct subsidiary CGUI (which is the direct parent of Yorkshire). Accrued investment profits on these funds could then be dividended further upstream, but the actual $12 million "asset" would remain available to the parties to the DMG (of which Ocean Marine will remain one), because these assets may not be dividended upstream. Ocean Marine, having assumed the transferor Corporations' surplus lines obligations and itself having surplus lines authority in the United States, would continue to maintain a trust fund in the United States sufficient to satisfy the United States' regulatory requirements relating to its surplus lines obligations (which, post transfer would include liabilities currently held by Yorkshire and Indemnity Marine).

Claims against the transferor Corporations are currently managed by Resolute Management, Inc. ("Resolute"), which is an affiliate of NICO, pursuant to an agreement that gives Resolute full authority and management discretion to settle, litigate and pay claims. The proposed Transfer Scheme does not alter this agreement, except to transfer the transferor Corporations' rights and obligations to Ocean Marine.

Ms. Deane testified that under UK law the UK Final Order effects a statutory novation of all of the rights and current or future obligations under the policies of the transferor Corporations to Ocean Marine.

The FSA monitored and participated in the Part VII transfer process in order to ensure that the procedural and substantive rights of interested parties were preserved. An independent expert was also appointed by the Corporations pursuant to

FSMA, which appointment was approved by the FSA.