In the Matter of AXONA INTERNATION-
AL CREDIT & COMMERCE LIMITED
(formerly Bancom International Limit-
ed), Debtor.

Bankruptcy No. 83 B 10195.

United States Bankruptcy Court,
S.D. New York.

July 8, 1988.

As Amended Aug. 11, 1988.

598

Stroock & Stroock & Lavan, New York City (Daniel Golden and Melvin A. Brosterman, of counsel), for trustee.

Zalkin, Rodin & Goodman, New York City (Henry Goodman and Harold N. Schwinger, of counsel), for Chemical Bank.

Cleary, Gottlieb, Steen & Hamilton, New York City (Mark P. Friedman, of counsel), for Hong Kong Liquidators of Axona Intern. Credit & Commerce, Ltd.

Weil, Gotshal & Manges, New York City by Bruce R. Zirinsky, Irwin H. Warren, Richard B. Friedman, and Nicholas Gatto, for American Exp. Bank, Ltd., Mfrs. Hanover Trust Co. and State Street Bank Intern.

DECISION AND ORDER—ON APPLICATION TO SUSPEND THE CHAPTER 7 CASE AND DIRECT THE TURNOVER OF ASSETS, AND ON CROSS–APPLICATION TO DISMISS THE CASE AND VACATE AB INITIO ALL PROCEEDINGS AND SETTLEMENTS THEREIN

BURTON R. LIFLAND, Chief Judge.

## I. INTRODUCTION

The chapter 7 case before this Court is the progeny of a Hong Kong winding-up proceeding concerning this debtor, Axona International Credit & Commerce Limited (hereafter "Axona" or "Debtor") pending in the Supreme Court of Hong Kong. The United States chapter 7 trustee and the Hong Kong liquidators (collectively the "Joint Applicants"),[1] creatures of the U.S. and H.K. Courts respectively, have moved by way of a joint application (the "Joint Application") on notice to all creditors, asking this Court to exercise its discretion and suspend the U.S. chapter 7 case in accordance with Section 305(b) of the Bankruptcy Code (the "Code") and direct the turnover of the assets of the chapter 7 estate to the Hong Kong liquidators for distribution in the primary Hong Kong winding-up proceeding.

Although a broad range of parties have appeared in the case, Chemical Bank ("Chemical") alone opposes this request[2] and has cross-moved for an order dismissing the chapter 7 case and vacating *ab initio* all proceedings instituted therein. The motions, augmented by affidavits and exhibits, have been submitted by both sides for determination by this Court. Chemical has based its opposition upon a potpourri of statutory, jurisdictional and constitutional arguments.[3] While in the end, Chemical's strident objections can best be summed up as a grandiloquent exercise, they must be addressed, and in doing so this Court must navigate the relatively recently charted byways governing international bankruptcy as embodied in §§ 303, 304, and 305(b) of the Code. This mandates the application of the standards forged by Congress with a malleability intended to assist the Courts in administering the burgeoning number of multinational insolvency proceedings. In

1. The Hong Kong liquidators made a limited appearance pursuant to Section 306 of the Bankruptcy Code.

2. Chemical along with other U.S. Banks were made defendants by the Trustee in several adversary proceedings brought pursuant to the Trustee's avoiding powers under the Code. All of the banks, including Chemical, entered into consensual settlement agreements with the Trustee resolving those proceedings. In settlement of the adversary proceeding pending against it, Chemical paid to the Trustee approximately $2.8 million. If Chemical succeeds on the cross-motion it will regain the settlement funds.

3. In accordance with 28 U.S.C. 2403(a) the United States Attorney General was notified of the constitutional challenge raised by Chemical and was given the opportunity to intervene. After a review of the pleadings, the Attorney General chose not to do so.

turn, this requires close attention to the facts at hand.

## II. THE FACTS

### A. Axona's financial collapse

Axona was a Hong Kong registered deposit taking company with its principal place of business in Hong Kong. It operated as a wholesale bank. While Axona did not engage in the banking business in the United States, it did have assets in this country in the form of substantial bank deposits.

Axona's financial collapse was precipitated by the November 15, 1982 collapse of Dollar Credit and Financing Ltd. ("Dollar Credit"), a larger, unrelated deposit taking company. Its collapse caused Axona's lines of credit to be immediately cut and the cessation of Axona's ability to operate.

### B. The United States attachments

Axona's financial collapse triggered the immediate resort to United States Courts by three United States banks (collectively the "Attaching Creditors").[4] Each obtained *ex parte* attachments of Axona's substantial United States bank accounts, which aggregated approximately $3.8 million.

### C. The Chemical transaction

The Attaching Creditors were not alone in setting a course to reach Axona's assets before others to eliminate their exposure. Chemical also initiated a sequence of complex manoeuvres directed at self-help, which now serve as the cornerstone of Chemical's opposition to the Joint Application.

Chemical is organized under the laws of New York State with its principal office in New York City. Chemical had a banking relationship with Axona since 1975 and was its primary U.S. dollar clearing bank. Axona maintained a dollar demand deposit account at Chemical's New York main office ("Chemical N.Y.") and a Hong Kong dollar clearing account at its Hong Kong branch office ("Chemical H.K."). Chemical held personal guarantees from each of Axona's principal's in an amount up to US$4,000,000 each.

On November 15, 1982 Axona requested a US$3,000,000 loan for one month, from the Chemical branch office in Hong Kong (the "Time Loan"). The loan was approved that day. The US$3,000,000 proceeds were then disbursed to Axona's New York account on that day. This loan was an unsecured time loan, maturing in 30 days, and was to be repaid in New York by deposit of the funds to an account maintained by Chemical's Hong Kong branch at Chemical N.Y.

Unfortunately, November 15 was also the day Dollar Credit collapsed along with interbank support for deposit taking companies such as Axona. After learning of Dollar Credit's collapse that day, one of Axona's principal's contacted Chemical to relay that as a consequence of Dollar Credit's collapse, he did not believe Axona would be able to meet its ongoing obligations, including repayment of the Time Loan disbursed earlier that day.

Meetings were held the next day between Chemical and Axona's principals to address this problem. The result of these meetings was a complex plan devised by Chemical with the assistance of New York and Hong Kong counsel, and implemented by Axona's management, consisting of the immediate repayment of the Time Loan and

---

**4.** On November 19, 1982, American Express Ltd. (formerly American Express International Banking Corporation) ("American Express") obtained an *ex parte* order of attachment which was served on several U.S. banks. On November 23, 1982 American Express commenced an action against Axona in the United States District Court for the Southern District of New York (the "District Court") for the recovery of $1,823,041.

On November 23, 1982, Manufacturers Hanover Trust Company ("Manufacturers") commenced an action against Axona in the District Court for the recovery of $1,500,000. On November 23, 1982, Manufacturers obtained an *ex parte* order of attachment.

On January 20, 1983, Fleet National Bank commenced an action against Axona in the District Court for the recovery of $1,892,165 and contemporaneously obtained an *ex parte* order of attachment.

the creation of a new fully collateralized demand loan. The only reasonable explanation for this swift and complex series of manoeuvres was that they served as the means for Chemical to secure its US$3,000,000 exposure.

The plan involved the November 16, 1982 issuance of a new demand loan collateralized by a US$3,000,000 "call account" opened at Chemical's Hong Kong branch with funds advanced by Chemical and deposited into a New York account on that same day.

Two days later, on Friday November 19, American Express served a writ of attachment of Axona's assets held by Chemical N.Y. In response, on the following Monday, November 22, Chemical H.K. "sold" the recently acquired demand loan to Chemical N.Y. In addition, the US$3,000,-000 cash collateral account was transferred to Chemical N.Y. Chemical N.Y. then opened a new loan and Chemical H.K. was fully repaid. Chemical New York then "deemed itself insecure" with respect to the demand loan and offset its claim against Axona. Axona's indebtedness to Chemical was fully satisfied by this setoff.

D. The Hong Kong winding-up proceedings

On February 2, 1983, pursuant to Section 179 of the Hong Kong Companies Ordinance (Chapter 32 of the Laws of Hong Kong) (the "Companies Ordinance") a creditor of Axona filed a petition with the Supreme Court of Hong Kong (the "Hong Kong Court") for the compulsory winding-up of Axona. A cardinal principle governing proceedings under the Companies Ordinance, which is derived directly from the English Companies Act, is equality of distribution. *See* Section 250 of the Companies Ordinance. *See generally*, December 2, 1986 Affidavit of Nicholas John Bennett (the "Bennett Aff."), a member of Wilkinson & Grist, Solicitors, Hong Kong.

On February 4, 1983, the Hong Kong Court appointed Michael J. Johnson and Eoghan M. McMillan, partners in the Hong Kong office of Arthur Andersen & Company, as joint provisional liquidators (the "Liquidators"). The Liquidators are officers of the Hong Kong Court and are responsible to that Court which can, for cause, remove them from office. Section 196(1) of the Companies Ordinance. The Liquidators' activities are monitored by the Hong Kong Court and any party in interest may apply to the Court to review the Liquidators activities and if necessary, the Court may make an appropriate order. Section 200(5) of the Companies Ordinance. The Hong Kong Court has ultimate control of the Liquidators remuneration. Section 196(2) of the Companies Ordinance. In addition, the Official Receiver, a government official not unlike the United States Trustee under the Code, (28 U.S.C. § 586), has a supervisory role in a winding-up proceeding, including the obligation to audit the Liquidators' accounts twice a year. *See* Sections 195(b), 202, 203 and 204 of the Companies Ordinance.

On March 4, 1983, the Hong Kong Court ordered Axona wound-up under the Companies Ordinance and continued Messrs. Johnson and McMillan as permanent liquidators. The Liquidators have duly qualified as such under the Companies Ordinance.

E. The Commencement of the Involuntary Case

Immediately upon their provisional appointment, the Liquidators learned of the attachments made by the Attaching Creditors in the United States. The Liquidators also suspected that Axona may have been the victim of a substantial fraud committed by U.S. entities.

In light of this information, and as is set forth in the opinion from the Hong Kong High Court [5] the Liquidators sought advice from their U.S. counsel, Cleary, Gottlieb, Steen & Hamilton ("Cleary"), as to the alternatives available to them under the

---

5. See *American Express International Corporation, et al. v. Michael J. Johnson, et al.* [1984] HKLR 372 at 375 (attached to "Further Affidavit of Nicholas Bennett"), an opinion issued by

Judge Hunter of the Hong Kong High Court in response to the application by the Attaching Creditors to withdraw the Liquidators authority to pursue the United States bankruptcy case.

U.S. Bankruptcy Code to secure the preservation and protection of Axona's U.S. property. In a February 7, 1983 memorandum (the "Cleary Memo," exhibit 1 to Chemical's appendix to its cross-application for relief), Cleary considered the options available to the Liquidators—commencement of an involuntary case under § 303(b)(4) of the Code or an ancillary proceeding under § 304. The Cleary Memo opined that because it was doubtful that a foreign liquidator in a § 304 ancillary proceeding could utilize a *trustee's* avoiding powers, 11 U.S.C. §§ 547, 548 and 553, the Liquidators goals would best be served by initiating a full involuntary liquidation case under § 303(b)(4).

The Cleary Memo reasoned that the Code, and before that the 1898 Bankruptcy Act, specifically contemplated the initiation of a U.S. bankruptcy case by a foreign representative for the specific purpose of avoiding preferential or fraudulent dispositions of property and obtaining the administration of assets located in this country concurrently with an administration of the property involved in a foreign administration. Thus, even though the Liquidators would relinquish control of Axona's U.S. assets to an American bankruptcy trustee, the Liquidators decided it would be in the best interest of Axona's worldwide creditor body to commence a United States bankruptcy case to secure Axona's assets for distribution.

By order dated February 8, 1983, the Hong Kong Court authorized the Liquidators to file an involuntary chapter 7 petition against Axona under § 303(b)(4) of the Code for the preservation of assets located in the United States for the benefit of Axona's creditors.

In accordance with that authority, on February 9, 1983, the Liquidators filed an involuntary chapter 7 petition against Axona in this Court. On April 12, 1983, after notice to parties in interest including Chemical and the U.S. Banks, the late Judge Galgay overruled the objection filed by the Attaching Creditors [6] and entered an order for relief. Chemical did not object to the commencement of this case. Albert Togut was immediately appointed interim trustee ("Trustee"), and by operation of Section 702(d) of the Code, has duly qualified.

## F. The Trustee's administration of the U.S. case

Upon his appointment, armed with the benefit of the automatic stay, 11 U.S.C. § 362(a), the Trustee, with the assistance of the Liquidators, sought to locate and marshal Axona's assets located in the United States. He immediately identified several U.S. banks in which Axona maintained bank accounts. After extensive negotiations, the Trustee obtained the turnover of approximately $500,000 from those banks in accordance with § 542 of the Code.

On October 18, 1983, the Trustee commenced adversary proceedings against the Attaching Creditors seeking to recover as preferential transfers pursuant to 11 U.S.C. § 547, the funds obtained by the banks pursuant to the prepetition attachments. After extensive litigation, the Trustee and the Attaching Creditors entered into settlement agreements whereby those Creditors paid over to the Trustee in excess of $3,300,000. Additional adversary proceedings were later commenced against two of the Attaching Creditors which were settled by the payment of an additional $1,125,000 to the Trustee.

On October 24, 1984 the Trustee commenced an adversary proceeding pursuant to §§ 542, 547 and 553 of the Bankruptcy Code seeking to recover the transfers effectuated by Chemical in November, 1982. The Trustee also sought the turnover of funds in Axona's account at Chemical pursuant to § 542 of the Code. Chemical's answer substantially denied the allegations in the complaint, and asserted, *inter alia,* affirmative defenses virtually indistinguishable from the constitutional and jurisdictional challenges raised herein to defeat

---

**6.** The Attaching Creditors instituted proceedings in the United States and Hong Kong challenging the Liquidators initiation of a U.S. bankruptcy case. *See generally American Express International Banking Corp., et. al. v. Johnson, et.al,* [1984] HKLR 372.

the motion to suspend the U.S. bankruptcy case.

After protracted discovery and motion practice, the parties entered into settlement negotiations which culminated in a settlement agreement approved by this Court on May 29, 1986 (the "Settlement Agreement"). In accordance with the Settlement Agreement Chemical paid over to the Trustee approximately US$2,770,000. However, the Settlement Agreement reserved Chemical's right to contest the jurisdiction of this Court to administer Axona's U.S. bankruptcy case.

The Trustee, in keeping with the duties set forth in § 704 of the Code, has also investigated other sources of recovery.

### G. Status of Hong Kong Winding–Up Proceeding

Upon appointment, the Liquidators took possession of all of Axona's books and records. Since that time they have identified, investigated and prosecuted claims to marshal Axona's assets for the benefit of all creditors. To date, the Liquidators have recovered approximately HK$42,000,000 (approximately US$5,384,000), net of expenses.

Over 150 creditors have filed proofs of debt in the Hong Kong winding-up proceeding. In accordance with the provisions of Hong Kong law the Liquidators, assisted by Arthur Andersen & Co., have adjudicated the proofs of debt filed in Hong Kong. In so doing they have complied with the applicable provisions of the Companies Ordinance concerning preferences and set-offs. *See* Sections 264, 266, 269 and 270 of the Companies Ordinance and the December 2, 1986 Affidavit of Eoghan McMillan (the "McMillan Affidavit"). The

Liquidators have also approved certain proofs of debt filed by U.S. creditors in accordance with stipulations settling various U.S. adversary proceedings.

### H. The factors underlying the Joint Application

The Joint Application alleges that the administration of Axona's bankruptcy case under the aegis of this Court has been substantially achieved. It is conceded that the Trustee's focus has been upon the recovery of Axona's funds seized by the Attaching Creditors and Chemical shortly before the commencement of the Hong Kong winding-up proceeding. With this now achieved, the Joint Application alleges there is no longer any compelling reason to continue the costly, bifurcated international administration of Axona's estate. Instead, the Joint Applicants believe it is in the interests of comity, equity, and economical and expeditious administration that the U.S. chapter 7 case be suspended and the estate turned over to the Liquidators, 11 U.S.C. § 305(b).[7] If this application is granted, the Liquidators intend to make an interim distribution to *all* creditors in Hong Kong dollars in accordance with the rate of exchange prevailing on March 4, 1983, the date of the entry of the order to wind-up Axona's affairs.[8] It is alleged that no prejudice will result from distribution in accordance with Hong Kong law inasmuch as Hong Kong is a sister common law jurisdiction with a distribution scheme substantially similar to ours. *See generally* Bennett Affidavit.

### III.  ISSUES PRESENTED

The Joint Applicants find support for their application in the plain language of § 305(a)(2) of the Code which authorizes

---

**7.** The reason given for choosing suspension and not dismissal under § 305(b), is that there are some open matters, including the question of whether the U.S. estate will be required to pay U.S. taxes. In addition, the Trustee filed two considerable proofs of claim in pending U.S. bankruptcy cases that require monitoring.

It is anticipated the Trustee will retain approximately $500,000 to satisfy any tax liability and expenses of administration.

**8.** The Joint Application asserts that only two creditors who have filed claims in this case have not filed claims in Hong Kong: (i) the City of New York in the amount of $2,600; and (ii) Chemical Bank in the amount of $2,769,933.

If the Joint Application is granted, the Trustee intends to provide the Liquidators with a list of the filed proofs of claim. The Liquidators intend to notify any creditor who has not filed a proof of debt in the Hong Kong proceeding of such creditors right to do so.

the suspension of a bankruptcy case upon the request of a foreign representative.[9] They maintain that § 305(b), which incorporates the principals governing ancillary proceedings carried in § 304(c), combined with legislative history, related statutes and case law under the Code and the 1898 Bankruptcy Act ("Act") envision the turnover of assets recovered in cases commenced under § 303(b)(4) and suspended under § 305 in favor of the primary foreign proceeding.

Chemical alone has come forward to oppose the Joint Applicants' request.[10] Chemical's opposition, purporting to raise issues of first impression of constitutional dimension, bandies a smokescreen of dubitable arguments pitched to preserve the preferred posture Chemical obtained by virtue of its November 1982 machinations. The thrust of this attack is aimed at the Trustee's utilization of the avoiding powers as the basis for the now settled Chemical adversary proceeding. Chemical's far from clear challenge may be distilled as follows:

### A. The Statutory And Jurisdictional Challenges

Chemical alleges that this Court does not have subject matter jurisdiction over Axona's § 303(b)(4) case, because under the unique facts presented, Axona's case could only be maintained as a § 304 ancillary proceeding. To avoid the constitutional infirmities Chemical perceives in the statutory scheme, Chemical would rewrite the Code to add the following requirements for the initiation of a § 303(b)(4) case by a foreign representative: (i) the foreign debtor must have a business presence in the United States and it must be shown that U.S. creditors have conducted business with the foreign debtor in the U.S.; or (ii)

there are creditors who have dealt with the foreign debtor in its domicile who have flouted a foreign judgment or order; or (iii) a foreign representative will only utilize the law of the debtor's domicile to recover a transfer. *See,* Memorandum of Law of Chemical Bank in Opposition to Joint Application at 41–42.

### B. The Constitutional Challenges

Chemical also seeks dismissal of Axona's case for cause pursuant to § 707(b) of the Code and Rule 15 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York ("Local Rules"). Chemical argues that the Trustee's utilization of the avoiding power granted by the Bankruptcy Code constituted an impermissible taking in derogation of the Fifth Amendment and a violation of Chemical's right to equal protection. In support of its nebulous equal protection and Fifth Amendment challenges, Chemical alleges Congress erred in giving a foreign representative what is alleged to be the

> unilateral option of applying either the bankruptcy or equivalent laws of Hong Kong or the Bankruptcy Code of the United States to attack or invalidate transactions which arose in Hong Kong, while United States citizens have not been granted an equal and reciprocal opportunity to make such an election and, under principles of comity, the more stringent provisions of the United States Bankruptcy Code would not apply to preferences and setoffs made and received by citizens of Hong Kong.

Cross–Application and Response of Chemical Bank, dated February 5, 1987 at 8–9.

This argument encompasses a choice of law challenge bottomed upon Chemical's view that it is fundamentally unfair to al-

---

**9.** It is not disputed that the Liquidators are "foreign representatives" within the meaning of § 101(23) of the Code and that the Hong Kong winding-up proceeding is a "foreign proceeding" within the meaning of § 101(22).

**10.** The Attaching Creditors initially opposed the Joint Application alleging that the transfer of the U.S. estate to Hong Kong and the concomitant exchange to H.K. dollars would result in

the devaluation of the distribution that would be made to U.S. creditors who would have to re-exchange the H.K. dollar distribution to U.S. dollars. This "exchange rate" problem was resolved and the objection withdrawn.

While Chemical has raised the same objection, Chemical has not joined in the resolution reached by the Attaching Creditors and the Liquidators.

low the Liquidators to take advantage of U.S. law to invalidate the November 1982 transaction which is alleged to have been "inherently a Hong Kong transaction." [11] Chemical, a U.S. entity, asserts it could not reasonably anticipate U.S. law would apply. In Chemical's view this unfairness is exacerbated because Chemical believes the November 1982 transaction would not be avoidable under Hong Kong law. The Joint Applicants disagree.[12]

In addition Chemical raises a Constitutional challenge to this Court's power to order suspension of Axona's case under § 305(a) because § 305(c) makes such an order unreviewable.

## IV. DISCUSSION OF THE LAW

A. The Statutory Challenge—The Interplay Among Sections 303, 304 And 305 Of The Code

The common theme running through Chemical's challenge is an assault on the plain language of the statutory scheme upon which the Liquidators relied in commencing a full U.S. bankruptcy case. In light of Chemical's assault on the framework established by Congress to govern international bankruptcies, this Court must meet Chemical's challenge with an analysis of the plain language Congress wrote. *See* Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527 (1947).

Congress, in formulating the provisions of the 1978 Bankruptcy Reform Act governing foreign bankruptcies was not unaware of the increasing growth of multinational businesses. Congress was also well aware of the complexities that arose when a large multinational entity became enmeshed in a foreign bankruptcy proceeding, in light of the collapse of several European financial institutions in the late 1970's. Experience had taught that in such cases there would be a mad scramble to the U.S. Courts for immediate attachments in contravention of the established goal of U.S. and international bankruptcy law to preserve assets for equitable distribution for all creditors wherever located. *See Banque de Financement, S.A. v. First National Bank,* 568 F.2d 911 (2d Cir.1977) (hereafter *"Finabank"*); *Israel–British Bank (London) Ltd. v. Fed. Dep. Ins. Corp.,* 536 F.2d 509 (2d Cir.1976) *cert. denied,* 429 U.S. 978, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976) (hereafter *"IBB"*); *Report of the·Commission on Bankruptcy Laws of the United States,* H.R.Doc. No. 137, Part II, 93d Cong., 1st Sess. 69–71 (1973) ("Commission Report"); *Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 1435–56 (1976) *("Hearings").* *See generally* 2 *Collier Practice Guide* ¶ 19.02 (1987); 2 *Collier on Bankruptcy* ¶ 304.01 (15th ed. 1988).

Such an unambiguous historical gloss should put to rest Chemical's reliance on the "unique facts" of this case as the basis for its opposition to the Joint Application. As Justice Cardozo wrote, the words came into the statute "freighted with the meaning imparted to them by the mischief to be remedied and by contemporaneous discussion." *Duparquet Huot & Moneuse Co. v. Evans,* 297 U.S. 216, 221, 56 S.Ct. 412, 414, 80 L.Ed. 591 (1936).

Congress was also aware that the 1898 Act did not contain express authority to afford a foreign representative the flexibility required to resolve the problems that arose when foreign proceedings were instituted and creditors seized assets located in the United States. *See generally Cunard S.S. Co. v. Salen Reefer Services A.B.,* 773 F.2d 452, 455 (2d Cir.1985) *("Salen I").*

---

**11.** While Chemical attempted to characterize the November 1982 restructuring as Hong Kong based, without any U.S. connection, the facts belie this characterization.

**12.** Chemical has submitted reams of paper in support of its view that the November 1982 restructuring would not be avoidable under Hong Kong law. *See* Affidavit of David John Beaves, dated February 3, 1986, and Further Affidavit of Mr. Beaves dated April 3, 1986.

The Joint Applicants ardently disagree with Chemical's interpretation of Hong Kong Law. *See* Further Affidavit of Nicholas John Bennett, dated March 18, 1987.

Under the Act, a foreign representative did not have authority to institute a bankruptcy proceeding in a United States Bankruptcy Court. 2 *Collier on Bankruptcy,* ¶ 304.01 at 304–4 (15th ed. 1988). Only the debtor or its creditors could initiate, oppose or suggest suspension of a U.S. bankruptcy case pursuant to Section 2a(22) [13] and former Rule 119.[14] *Id.* at n. 5 (citing H.R.Doc. No. 137, 93d Cong. 1st Sess., pt. II, pp. 69–71 (1973); *Hearings,* 1443 (1976) (Statement of Professor Kurt H. Nadelmann)).

Although there was no statutorily recognized basis for a foreign representative to intervene in the U.S. Bankruptcy Courts, U.S. Courts often deferred to foreign case administration in the name of comity. *Id.* at 304–4. They did so with an awareness that the U.S. Court "is thus not obliged to protect the positions of fast-moving American and foreign attachment creditors over the policy favoring uniform administration in a foreign court." *In re Culmer,* 25 B.R. 621, 629 (Bankr.S.D.N.Y.1982) (citing *Finabank,* 568 F.2d at 921).

In the *IBB* case, a British bank filed a petition for the winding-up of its affairs with the High Court of Justice, Chancery Division of the United Kingdom. Israel–British Bank carried on little U.S. banking business, but did have substantial U.S. bank accounts. Shortly thereafter, Israel–British Bank filed a voluntary bankruptcy petition in the Southern District of New York for the specific purpose of avoiding preferential attachments and to obtain the administration of assets located in this country. *IBB,* 536 F.2d at 511. After defeating a jurisdictional challenge that worked its way to the Court of Appeals (*see* 536 F.2d 509), the Trustee's administration yielded an estate in excess of $3,000,000, a substantial portion of which was obtained by utilization of the substantive provisions of the Act, including § 67a(1) which authorized the avoidance of preferences.

Thereafter, a motion was made to suspend the case pursuant to Section 2a(22) of the 1898 Code and Rule 119 of former Bankruptcy Rules. Judge Galgay, over the objection of American creditors, suspended the U.S. case and directed the Israel–British Bank trustee to transfer the U.S. estate to the English liquidators for distribution in accordance with English law.[15]

Judge Galgay based his decision in part on the *Finabank* case, an Act case in which the Second Circuit Court of Appeals determined that the substantive provisions of U.S. bankruptcy law could be utilized to aid a primary foreign proceeding. *Finabank,* 568 F.2d at 918–20. In *Finabank,* the debtor was a Swiss banking corporation involved in a Swiss liquidation proceeding. There too, the debtor did no business in the U.S., but did have substantial U.S. bank accounts. And, like Israel–British Bank, Finabank also filed a U.S. bankruptcy case to utilize U.S. law to avoid preferences and to defeat attachments. *Id.* at 918. In *Finabank,* the Court of Appeals reversed a Bankruptcy Court's dismissal of the U.S. bankruptcy case recognizing that international bankruptcies can raise problems "not contemplated by the Act", requiring some flexibility as a necessary response to achieve equal distribution among creditors. *Id.* at 918. The Court held that a United States Bankruptcy Court is authorized to dismiss the American proceeding or after setting aside preferences, "to suspend the proceeding and permit assets located in this country to be administered pursuant to the domiciliary proceeding." *Id.* at 919. The *Finabank* decision demonstrated a realistic understanding of the difficulties encountered by foreign trustees in marshalling

---

**13.** Former § 2a(22) authorized a bankruptcy court to exercise, withhold or suspend the exercise of jurisdiction when a debtor had been adjudged bankrupt by a foreign court.

**14.** Former Bankruptcy Rule 119 provided for the dismissal or suspension of a case where a foreign proceeding was pending "under such terms as may be appropriate, after a hearing on notice, having regard to the rights and convenience of local creditors and other relevant circumstances."

**15.** Judge Galgay's "Findings of Fact and Conclusions of Law" granting the motion to suspend the U.S. bankruptcy case over the opposition of U.S. creditors is reprinted in full in Nadelmann, *Israel–British Bank (London) Ltd: Yet Another Trans–Atlantic Crossing,* 52 Am.Bankr.L.J. 369, 371–81 (1978).

assets when some of those assets have been attached in other jurisdictions by quick-on-the-trigger creditors.

Guided by these teachings, Congress, in addressing foreign bankruptcies under the Code, endeavored to establish a statutory scheme that could provide a foreign representative with the flexibility required to confront the multitude of situations that could arise in an unfolding international case. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 324–325 (1977) ("House Report"); S.Rep. No. 95–989, 95th Cong. 2nd Sess. 35 (1978) ("Senate Report"). Not surprisingly, Chemical would like to scuttle this scheme because it has effectively interdicted the race to the courthouse, which, as Judge Gurfein observed in the *IBB* case, is not the same as "[t]he road to equity." *IBB*, 536 F.2d at 513.

The Code gives a foreign representative the option to: (1) file an involuntary case under § 303(b)(4); (2) commence a case ancillary to a foreign proceeding under § 304; or (3) seek the dismissal or suspension of a case pursuant to § 305. Each alternative addresses different objectives, affording the flexibility required to deal with local aspects of a foreign bankruptcy case.

### (1) *§ 303(b)(4)*

■ The filing of an involuntary case by a foreign representative pursuant to § 303(b)(4) initiates an independent U.S. bankruptcy case creating an estate within the meaning of § 541 of the Code. The foreign debtor is afforded the same treatment as a domestic debtor. *See 2 Collier on Bankruptcy* ¶ 304.01 at 304–7 (15th ed. 1988). In a case under § 303 a trustee or debtor-in-possession has the unquestionable power to utilize the provisions of the Code to avoid preferential or fraudulent dispositions of property. *See 2 Collier Bankruptcy Practice Guide* ¶ 19.07[1] (1987); *see also In re Gee*, 53 B.R. 891, 896 (Bankr. S.D.N.Y.1985.), ("[a] chapter 11 case, on the other hand, gives rise to an automatic

stay and, unless a trustee is appointed for cause, clothes the debtor in possession with the ability to avoid transfers which, absent bankruptcy, it could not otherwise undo."). In addition, the automatic stay of § 362(a) of the Code is immediately effective upon the filing of the petition. *See 2 Collier Bankruptcy Practice Guide* ¶ 19.07[1] (1987).

■ Chemical's argument that this remedy is a "unilateral option" granted a foreign representative is simply wrong. Any of Axona's creditors could have filed an involuntary petition under § 303(b)(1), (2) or (3) of the Code to invoke the jurisdiction of the U.S. Courts, and Chemical would have been met with an identical adversary proceeding to avoid the November 1982 "setoff." "[T]he authority to file an involuntary petition conferred upon a foreign representative under § 303(b)(4) does not deprive others of relief under the Code to which they are otherwise entitled." *2 Collier Bankruptcy Practice Guide* ¶ 19.06 (1987).

### (2) *§ 304*

■ The Code also gives a foreign representative the option to file a case ancillary to a pending foreign proceeding. 11 U.S.C. § 304. "A case under Section 304 is not a full-scale bankruptcy case with an automatic stay prohibiting dismemberment of assets by vigilant creditors *or with avoiding powers given to a fiduciary, be it a trustee or debtor-in-possession*, to ensure equality of distribution among creditors [citation omitted, emphasis added]." *In re Gee*, 53 B.R. 891, 896 (Bankr.S.D.N.Y.1985). Instead, a 304 case is a limited one, designed to function in aid of a proceeding pending in a foreign court.[16] *2 Collier on Bankruptcy* ¶ 304.01 at 304–7, 8 nn. 14 & 15 (15th ed. 1988). In an ancillary case, the court "is free to broadly mold appropriate relief in near blank check fashion...." *In re Culmer*, 25 B.R. at 624.

---

**16.** To implement the congressional policy the court is empowered to, *inter alia*, (1) enjoin any action against—(i) a debtor....; or (2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or (3) order other appropriate relief. 11 U.S.C. § 304(b).

A § 304 ancillary proceeding was conceived as a more efficient and less costly alternative to a full bankruptcy case. However, notwithstanding Chemical's wish that it were otherwise, Congress gave a foreign representative the option of commencing a full bankruptcy case if the estate is substantial enough to require a full case for proper administration. *Section 304 was not intended to be a foreign representatives exclusive remedy. Salen I,* 773 F.2d at 455–56. Chemical's restrictive reading of § 303(b)(4) would so limit its scope as to render it largely duplicative of § 304, a result that would "offend[ ] the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed. 2d 207 (1973).

Thus, inasmuch as the major impetus for the Liquidators' resorting to the U.S. Courts to avoid U.S. setoffs and attachments was well within the contemplation of Congress, it is proper that a § 303(b)(4) case be utilized to set aside those transfers for the benefit of all.[17] *See Commission Report* at 71; 2 *Collier on Bankruptcy* ¶ 304.01 at 304–10 (15th ed. 1988); 2 *Collier Bankruptcy Practice Guide* ¶ 19.07 (1987).

Indeed, even if it were somehow improper for the Liquidators to commence a U.S. bankruptcy case for the sole purpose of utilizing the avoiding powers, the Liquidators had other reasons for choosing a § 303 case over an ancillary case under § 304. Filing a § 303 petition triggered the automatic stay to prevent further dismemberment of Axona's estate, whereas under § 304 it would have been necessary to request injunctive relief. In addition, in light of the Liquidators suspicion that Axona may have been defrauded by American creditors the Code also gave the Trustee broad based power to compel examinations to support his investigation.

### (3) *§ 305*

■ The final element in the statutory scheme is § 305(a)(2) which authorizes suspension or dismissal of a U.S. case if the factors specified in § 304(c) (governing the grant of relief in an ancillary proceeding) are satisfied. This provision serves as Chemical's sole statutorily based challenge to the Joint Application, although Chemical chose not to phrase it as such. Notwithstanding the plain language of the statute,[18] Chemical argues that suspension in accordance with § 305(a) should not be granted once the Code's avoiding powers have been invoked. In Chemical's scheme, at that juncture the Trustee became duty-bound to make a distribution to creditors in accordance with § 726.

Chemical also asserts that principles of "comity" warrant denial of the Joint Appli-

---

**17.** Early authority suggested Bankruptcy Court's have discretion to authorize utilization of the avoiding powers under the Code in a § 304 ancillary proceeding. *E.g., In re Trakman,* 33 B.R. 780, 783 (Bankr.S.D.N.Y.1983); *In re Egeria Societa Per Azioni Di Navigazione,* 26 B.R. 494, 497 (Bankr.E.D.Va.1983); *In re Comstat Consulting Services Ltd.,* 10 B.R. 134, 135 (Bankr.S.D.Fla.1981).

However, later cases and the commentators have concluded that the avoiding powers under the Code are not available in an ancillary proceeding. *E.g., In re Lines,* 81 B.R. 267, 270 n. 1 (Bankr.S.D.N.Y.1988); *In re A. Tarricone, Inc.,* 80 B.R. 21, 23 (Bankr.S.D.N.Y.1987); *In re Metzeler,* 78 B.R. 674, 677 (Bankr.S.D.N.Y.1987). *See also* 2 *Collier Bankruptcy Practice Guide* par. 19.07[1] (1988).

**18.** Section 305(a) provides, in pertinent part "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, *at any time* [emphasis added]...."

Chemical finds support for its argument that suspension may not be sought after utilization of the avoiding powers in 2 *Collier on Bankruptcy* par. 304.01 at 304–11 (15th ed. 1988). The treatise finds support for this proposition in a passing sentence in the legislative history. *See* H.R.Rep. No. 595, 95th cong., 1st Sess. 324 (1977). However, a thorough reading of the legislative history and the case law cited herein construing § 2a(22) and former rule 119, makes it clear that this analysis is unfounded. *See generally Report of the Commission on Bankruptcy Laws of the United States,* H.R.Doc. No. 137, Part II, 93d Cong., 1st Sess. 69–71 (1973) ("Commission Report"); *Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 1435–56 (1976).

cation because suspension would result in "unfair treatment" to U.S. creditors—viz. Chemical. In Chemical's view, comity would not permit the use of the Code's avoiding powers for the benefit of foreign creditors where the transaction could not be avoided under applicable foreign law. Chemical also sees fundamental unfairness in the fact that if suspension were granted and distribution made in H.K. dollars, because of the operation of fluctuating exchange rates, Chemical would receive a reduced distribution.[19]

Suffice it to say a proper application of the factors carried in § 304(c), which include comity, should safeguard Chemical's right to fair treatment. As will be demonstrated, but for the jurisdictional and constitutional challenges which remain, a reasoned application of the statutory scheme satisfies this Court that Chemical has raised no factual or legal issue to merit denial of the Joint Application.

Section 305(a) authorizes a court to dismiss or suspend a case in favor of the primary foreign proceeding based upon the six enumerated factors set forth in Section 304(c).[20] These guidelines also govern the determination as to whether to issue a turnover order in an ancillary case under § 304(b).

Section 305(a) is the offspring of § 2a(22) of the Act and former Bankruptcy Rule 119, which have been construed as authority for the issuance of a turnover order and dismissal or suspension in favor of the primary foreign proceeding. See Commission Report at 69–71; Hearings at 1435–

56, Statement of Kurt H. Nadelmann; Finabank, 568 F.2d 911; IBB, 536 F.2d 509. In determining whether to authorize suspension, "the court shall be guided by what will best assure an economical and expeditious administration...." 11 U.S.C. § 304(c). Comity is a guiding factor in this determination.

Comity has been defined as the "recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

As this Court observed in Culmer, where turnover of assets to a debtor's Bahamian representative was granted in accordance with §§ 304(b) and (c), "[a]ll of the factors listed in Section 304(c) have historically been considered within a court's determination whether to afford comity to a proceeding in a foreign nation." In re Culmer, 25 B.R. at 629. The Second Circuit has only recently reaffirmed the importance of principles of comity in construing § 304(b). The Court stated that the drafters of the Code "did not intend to overrule in foreign bankruptcies the well-established principles based on considerations of international comity [citations omitted]." Salen I, 773 F.2d at 456. A reading of the case law serves only to reinforce this Court's view that the proper interpretation of comity requires an analysis far broader than Chemical's literal and myopic reading of

19. Chemical has given no authority for its myopic reading of comity. Indeed, it has failed to refer to § 502(b) of the Code which, like Hong Kong law, refers to the date of the entry of the order for relief as the appropriate date for conversion of foreign currency claims.

It also bears noting that two-thirds of the proofs of debt filed in Hong Kong were stated in currencies other than Hong Kong dollars. In all instances, these claims have been converted into Hong Kong dollars by application of the appropriate March 4, 1983 exchange rate.

20. Section 304(c) provides, in pertinent part, that:

"[T]he court shall be guided by what will best assure an economical and expeditious adminis-

tration of such estate, consistent with—(1) just treatment of all holders of claims against or interests in such estate; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of such estate; (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; (5) comity; and (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns."

Inasmuch as Axona is not an individual, the sixth factor is not relevant.

§§ 303, 304, and 305. "Although the early cases upheld the priority of local creditors' attachments, [citation omitted], the modern trend has been toward a more flexible approach which allows the assets to be distributed equitably in the foreign proceeding." *Id.* at 458.

In *Salen I,* the debtor, Salen, was involved in a Swedish bankruptcy case. In accordance with Swedish law, actions against Salen by creditors were stayed. However, Cunard, a creditor, obtained an order of attachment in the United States. The District Court, relying on general principles of comity, subsequently vacated the attachment, deferring to the Swedish bankruptcy proceeding. The Second Circuit, in affirming the District Court, concluded:

> The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion. Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.

*Salen I,* 773 F.2d at 458.

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709 (2d Cir.1987) ("*Salen II*"), involving the same Swedish bankruptcy case, soon followed. In *Salen II* the Court of Appeals affirmed the District Court's order vacating another U.S. order of attachment, and remanded with directions to the District Court to issue an order directing the transfer of the U.S. funds to the Swedish liquidator. The Second Circuit criticized the creditor's attempt to secure a "captive fund", pointing out that such actions are "likely to affect other creditors, not parties to the proceeding, who obeyed the Swedish Court's stay and sought relief only in the bankruptcy proceeding." *Id.* at 714. Thus, such creditor self-help efforts take on a "public character." *Id.* Since the court in *Salen I* determined that Swedish bankruptcy law was "similar" to the Code, it decided that the public policy of ensuring equitable and orderly distribution of local assets of a foreign bankrupt would be furthered most effectively by deferral to the Swedish insolvency proceeding. *Id.*

Chemical's resort to self-help and its self serving interpretation of comity are akin to those of the U.S. creditors in *Salen I* and *II.* Notwithstanding Chemical's herculean effort to cast the facts of this case as unique and outside the ambit of controlling caselaw, nothing out of the ordinary occurred warranting a result different from that attained in a long line of cases in this Circuit. *See Finabank,* 568 F.2d 911; *IBB,* 536 F.2d 509; *In re Gee,* 53 B.R. 891; *In re Culmer,* 25 B.R. 621.

In accordance with the wording and legislative history of Section 304 the central examination that must be undertaken is whether the relief the Liquidators seek "will afford equality of distribution of the available assets." *In re Culmer,* 25 B.R. at 628. "Although comity is only one of six factors to be considered in determining whether to grant relief, it often will be the most significant, as here, where it serves as the crux of [the challenge]...." *In re Gee,* 53 B.R. at 901.

"Comity is to be accorded a decision of a foreign court as long as that court is of competent jurisdiction and as long as the laws and public policy of the forum state are not violated." *In re Culmer,* 25 B.R. at 629; *see also Hilton v. Guyot,* 159 U.S. 113, 202–03, 16 S.Ct. 139, 158–59, 40 L.Ed. 95 (1895); *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 629 (2d Cir.1976); *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (S.D.N.Y.1979). Indeed, "[c]ourts in New York have even more narrowly construed the exceptions to the comity doctrine, declaring: '[F]oreign-based rights should be enforced unless judicial enforcement of such a [right] would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.'" *In re Culmer,* 25 B.R. at 629, (citing *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (S.D.N.Y. 1979) (quoting *Intercontinental Hotels Corp. v. Golden,* 15 N.Y.2d 9, 13, 254 N.Y. S.2d 527, 529, 203 N.E.2d 210, 212 (1964)).

Courts have repeatedly granted comity to foreign proceedings in situations similar to Axona's. Thus in *Culmer*, this Court granted comity to Bahamian law and ordered the turn over of a debtor's estate to a Bahamian liquidator, based upon a determination that Bahamian insolvency law, like Hong Hong's, was derived from the English Companies Act. Similarly, in *Gee*, the Court granted comity to the Companies Law of the Cayman Islands, inasmuch as it too was derived from the British Companies Act and provided the necessary "fundamental standards of procedural fairness" for comity to be extended. *In re Gee*, 53 B.R. at 902. "Particularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed." *Id.* at 901, (citing *Clarkson Co., Ltd.*, 544 F.2d at 630 (In this case Canadian law was granted comity)).

Hong Kong, like the Bahamas, Cayman Islands, and Canada, is a sister common law jurisdiction whose winding-up law is derived from the British Companies Act. *See* Bennett Affidavit at ¶ 8. In construing its winding-up statutes, the Courts in Hong Kong apply the common law and rules of equity, and as a practical matter are bound by the decisional law of England. *Id.* at par 3–6. The Companies Ordinance is strikingly similar to the Code and provides a comprehensive procedure for the orderly and equitable distribution of assets to all creditors. The Liquidators are officers of the Hong Kong Court, subject to pervasive control by not only the Court, but also a Committee of Creditors. *Id.* at ¶ 17–21; *see also Companies Ordinance* §§ 195,

196(1), 200, 203 & 204. The Liquidators' accounts are audited bi-annually by the Official Receiver. *Id.* at ¶ 18; *Companies Ordinance* §§ 195(b), 202 and 203. The Companies Ordinance forbids creditors from suing the debtor after a winding-up order is made, except by leave of court, and it limits their remedies to filing proofs of debt. *Id.* at ¶ 15; *Companies Ordinance* § 186. All dispositions of the debtor's assets made after the commencement of the winding-up proceeding are deemed void unless otherwise ordered by the court. *Id.* at ¶ 13; *Companies Ordinance* §§ 182, 184.

█ In addition, preferences and other fraudulent conveyances are subject to avoidance. *Id.* at ¶ 16; *Companies Ordinance* §§ 266, 269, and 270. However, while Chemical makes much ado of an ambiguous choice of law/comity challenge,[21] alleging that the November 1982 restructuring did not violate Hong Kong law, Chemical misapprehends the meaning of "comity." A review of the Hong Kong statute makes it clear that the differences between U.K. and U.S. law may be characterized as minor procedural differences. Comity does not require the laws of different jurisdictions to be *identical*. Instead, the "foreign law must abide by standards of fundamental fairness." *Salen I*, 773 F.2d at 457; *See also, Kenner Products v. Societe Fonciere Et Financiere*, 532 F.Supp. 478, 479 (S.D.N.Y.1982) ("Foreign-based rights should be enforced unless the judicial enforcement of such a [right] would be the approval of a transaction which is inherently vicious, wicked or immoral and shocking to the prevailing moral sense." [citations omitted]); *Clarkson Co., Ltd.*, 544 F.2d at 629; *In re Gee*, 53

---

**21.** While Chemical urges that its argument can be understood as a question of choice of law, this argument holds no sway with this Court. This chapter 7 case like all cases under Title 11, is a classic federal question case, and there is no basis for engaging in any choice of law analysis. *See In re Environmental Research & Development*, 46 B.R. 774, 778 (S.D.N.Y.1985).

The cases relied upon by Chemical in support of its choice of law argument are inapplicable in that they are either diversity cases, state cases or cases under federal statutes that incorporate state law. *See e.g., Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 120 (2d Cir.1984), a case under the Edge Act, 12 U.S.C. § 632 (1982), which incorporates state law; *Miller v. Wells Fargo Bank Int'l Corp.*, 406 F.Supp. 452, 468 n. 9 (S.D.N.Y.1975), where choice of law was discussed in the context of the specific incorporation of state law under the Act to determine the date on which a transfer is deemed effective; *Hutner v. Greene*, 734 F.2d 896, 899 (2d Cir.1984), a diversity case; *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), a state court case involving choices by state courts among various states' laws.

B.R. at 901. Whether or not Hong Kong law is identical to American law, Hong Kong law is not repugnant to our ideas of justice, and is inherently fair and regular. *See In re Culmer*, 25 B.R. at 621. As a result, comity should be accorded in the instant matter.

Chemical has invited the Court to determine whether the 1982 restructuring of its loan would withstand an attack under Hong Kong law. Comity does not compel this Court to accept Chemical's invitation.

Chemical has cited cases in which courts have provided only limited comity to foreign bankruptcy proceedings. For example, in *In re Lineas Aereas de Nicaragua, S.A.*, the Court ordered turnover of the property of a foreign debtor located in the United States only upon the conditions that none of the debtor's assets located in the U.S. were to be removed, that they would be applied primarily to satisfy the debts owed to U.S. creditors, and that these assets would not be encumbered, assigned or abandoned by the trustee. *In re Lineas Aereas de Nicaragua, S.A.*, 10 B.R. 790, 791 (Bankr.S.D.Fla.1981). Substantively, the foreign representative's request for the turnover of property was denied, although, in form, it was granted. This decision has been criticized because of its emphasis on protectionism. *See generally* Note, Section 304 of the Bankruptcy Code: Has It Fostered the Development of an "International Bankruptcy System," Colum.J.Transnat'l L. 541, 566 (1984) (hereafter "Note"). However, to the extent the *Lineas Aereas* court adopted a limited reading of comity, caselaw in this Circuit teaches otherwise. Accordingly, this Court is not bound to accept such a limited interpretation of comity. *See e.g., Finabank*, 568 F.2d 911; *IBB*, 536 F.2d 509.

Similarly, in the case *In re Toga Mfg. Ltd.*, the Court denied a Canadian trustee's request pursuant to Section 304 for an injunction against creditor action and a turnover. *In re Toga Mgf. Ltd.*, 28 B.R. 165 (Bankr.E.D.Mich.1983). In *Toga*, an American creditor had been awarded a large settlement in an arbitration proceeding against the debtor and sought garnishments. *Id.* at 165–66. Since the Bankruptcy Court determined this creditor would lose its secured status in the Canadian proceeding, the Trustee's request was denied. The Court, relying on § 304(c)(4) concluded that a Canadian distribution would not be " 'substantially in accordance with the order prescribed by this title.' " *Id.* at 169 (quoting 11 U.S.C. § 304(c)(4)).

The limited focus in *Toga* on the minor substantive differences between Canadian and U.S. law prevented the Court from considering the full scope and procedural fairness of Canadian law. This case is simply an example of "[t]he court's paramount concern with the protection of the rights of U.S. creditors...." Note at 566. The result of the *Toga* decision was that the U.S. creditor was entitled to a disproportionate piece of the estate, to the detriment of all other creditors. This decision is out of line with the modern need for flexibility in the construction of comity.[22]

Chemical's reading of comity, to the extent it can be parsed at all, falls in line with the *Toga* and *Lineas Aereas* decisions.

A close look at Chemical's argument serves to highlight its flawed analysis. Chemical, a New York entity, not only had a longstanding relationship with Axona, but also involved its New York branch office in the November 1982 restructuring. However, notwithstanding this New York involvement, Chemical argues it is unfair that the Liquidators came to Chemical's

---

**22.** Another article addressing, *inter alia, Culmer* and *Toga* commented:

> [T]he old notion of comity demanded that courts afford domestic creditors maximum protection. The opinion in *Toga* deriving support from cases dating back to 1809, [*Harrison v. Sterry*, 9 U.S. (5 Cranch) 289, 3 L.Ed. 104 (1809)] and 1827 [*Ogden v. Saunders*, 25 U.S. (12 Wheat) 213, 6 L.Ed. 606 (1827)], shows that this notion is not completely extinct, al-
>
> though more recent cases rendered before the Code's enactment show a far more favorable attitude towards foreign bankruptcy proceedings. [Footnote omitted].

Huber, *Creditor Equality in Transnational Bankruptcies: The United States Position*, 19 Vand.J. Transnat'l L. 741, 748–49 (1986). That article attempts to reconcile the different results reached in *Culmer* and *Toga* by distinguishing their underlying facts. *Id.* at 754–57.

home to undo the 1982 transaction. Generally, cases in this area involve a U.S. entity's challenge to the use of *foreign* law in such situations, which may be the reason Chemical can find no authority for its challenge.

Chemical goes on to argue it would be more fairly treated if Hong Kong law were applied to undo the 1982 restructuring. Yet, in the same breath Chemical argues it would be *unfairly* treated if the case were suspended and Hong Kong law utilized to govern the disposition of Axona's estate. As the Supreme Court stated in *Canada Southern Railway v. Gebhard*, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883), in discussing the rights of U.S. Citizens who voluntarily deal with foreign corporations

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy, which binds those in like situations with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony. It follows, therefore, that anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere.

109 U.S. at 537–38, 3 S.Ct. at 369–70. *See also, Cornfeld v. Investors Overseas Services, Ltd.*, 471 F.Supp 1255 (the court deferred to a Canadian liquidation proceeding).

Satisfied that comity should be granted, this Court must also insure that the other relevant elements of § 304(c) are satisfied. Section 304(c)(1) requires "just treatment of all holders of claims against or interests in such estate." This section is satisfied because the Companies Ordinance, like the Code, provides a comprehensive procedure for the orderly and just treatment of all Axona's creditors. *See In re Culmer*, 25 B.R. at 629.

In addition, the vast majority of Axona's debts arose in Hong Kong, which is also where Axona's books and records are located. The Liquidators are best situated to evaluate creditors' claims fairly and at a minimum expense. To require the Trustee to obtain the records and review them anew would be inconsistent with the Code's mandate that a case be conducted in "the most economical and expeditious fashion". 11 U.S.C. § 304(c). Denial of the Joint Application would substantially increase the cost of administration, and would create unnecessary delay and duplication of functions performed by the Liquidators.[23]

The second factor to be considered is protection of U.S. claimholders against prejudice and inconvenience in the processing of claims in such foreign proceeding. 11 U.S.C. § 304(c)(2). Hong Kong law provides a simple method for filing proofs of debt. Hong Kong law does not discriminate against creditors residing outside of Hong Kong. Bennett Aff. at par 23. Each creditor may submit a proof of debt by mail. *Id.* at ¶ 24. If a creditor is dissatisfied with the Liquidators' adjudication in respect of a claim in the winding-up proceeding, the creditor may appeal in the Hong Kong Court. *Id.* at ¶ 25–26. In many cases, the appeal may be disposed of without a creditor appearing in court. *Id.* at ¶ 26.

Most of Axona's creditors have already filed proofs of debt in Hong Kong. Indeed, with only two exceptions, one of which

---

**23.** Chemical has conceded that if the Joint Application were denied and the Trustee required to make a distribution, Chemical would object unless the Trustee conducted his own review of the proofs of claim filed.

being Chemical, all creditors who have filed proofs of claim in the U.S. have also filed in Hong Kong. *See* Joint Application at ¶ 22 n. 4; *see also supra* n. 8. However, since there is no automatic bar date under Hong Kong law, the creditors may still file with the Hong Kong Court. Bennett Aff. at ¶ 27. Indeed, the Liquidators propose to send notices to these creditors inviting them to participate in the Hong Kong proceeding before a distribution is made. *See* Joint Application at ¶ 22(f). As in the *Culmer* case, since Chemical's claim against Axona is substantial, the cost of processing its claim in Hong Kong is *"de minimus* in comparison to the amount of ... [its] claim[ ]." *Culmer,* 25 B.R. at 630. Thus, entry of a suspension and turnover order will not prejudice or inconvenience U.S. creditors.

The third factor listed in § 304(c) is the "prevention of preferential or fraudulent dispositions of property of such estate." 11 U.S.C. § 304(c)(3). As explained above, the bulk of the estate recovered by the Trustee derives from his successful prosecution and settlement of adversary proceedings brought to avoid "preferential" transfers. But for these recoveries, certain creditors would have successfully achieved a preferred position to the detriment of Axona's creditors. In addition, the Liquidators have reviewed claims to insure that the Hong Kong preference statute has not been violated. *See* MacMillan Aff. at ¶ 9; Companies Ordinance §§ 264, 265. Inasmuch as the Trustee and Liquidators have successfully avoided preferential transfers, this element is also satisfied.

The remaining factor is "distribution of proceeds of such estate substantially in accordance with the order prescribed by this title." 11 U.S.C. § 304(c)(4). Relief is also proper under this section in that distribution under Hong Kong law will be substantially in accordance with the order and priorities prescribed by the Code. *Compare* Code § 507 *with* Companies Ordinance § 266. *See also* Bennett Aff. at ¶ 23. Moreover, several Courts have deferred to distribution pursuant to substantially similar schemes which, like Hong Kong's, are derived from the English Com-

panies Act. *See e.g., Canada Southern Railway v. Gebhard,* 109 U.S. 527, 3 S.Ct. 363 (Canada); *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (Canada); *In re Gee,* 53 B.R. 891 (Cayman Islands); *In re Culmer,* 25 B.R. 621 (Bahamas).

In keeping with leading cases in this Circuit which have taught that administration of international bankruptcy cases requires flexibility to insure equality of distribution among creditors; and satisfaction of each of the elements of the statute; turnover and suspension are warranted. However, Chemical's remaining objections must be addressed.

### B. The Jurisdictional Challenge

Chemical contends that this Court lacks the subject matter jurisdiction to enter an order for relief upon a § 303(b)(4) involuntary petition filed by a foreign representative where:

(1) The petition was filed with the explicit and acknowledged intent to invoke the Bankruptcy Code's avoiding powers (*but see* discussion *supra* at 607);

(2) the transaction to be avoided had been concluded prior to the commencement of the foreign winding-up proceeding;

(3) the foreign debtor (a) did not conduct business in the United States, (b) had no place of business in the United States, (c) had no employees in the United States, and (d) had approximately $500,000 in bank accounts in the United States which could have been turned over to the foreign representative upon request or pursuant to a § 304 petition; and

(4) all of the debts and liabilities of the foreign debtor were originally contracted between the foreign debtor and its creditors in the debtor's domicile. (Chemical's Brief at 39). These contentions bespeak a flawed interpretation on the part of chemical of the meaning of subject matter jurisdiction.

Subject matter jurisdiction speaks to the competence of a court "to hear and determine cases of the general class to which

the proceedings in question belong; the power to deal with the general subject involved in the action." *Noxon Chemical Products Co. v. Leckie,* 39 F.2d 318, 320 (3d Cir.1930), *cert. denied,* 282 U.S. 841, 51 S.Ct. 22, 75 L.Ed. 747 (1930). In the international bankruptcy case *In re Deak & Co., Inc.,* this Court addressed the issue of Bankruptcy Court subject matter jurisdiction:

> The Code specifically provides the district court where a Chapter 11 case is pending with exclusive jurisdiction over all property of the debtor and the estate. *See* 28 U.S.C. § 1334(d) (Supp. II 1984). This jurisdictional grant has been referred to bankruptcy judges under 28 U.S.C. § 157(a) (Supp. II 1984). *See* Standing Order of Referral of Cases to Bankruptcy Judges, July 10, 1984 (S.D. N.Y., Ward, J.) [ ("Standing Order of Referral") ]. Section 1334(d) provides the subject matter underpinning for this court's jurisdiction in bankruptcy matters; it has been broadly construed consonant with the Code's policy of adjudicating all claims and interests against property of the estate.

*Deak & Co., Inc. v. Soedjono, (In re Deak & Co., Inc.),* 63 B.R. 422, 426 (Bankr.S.D.N.Y.1986).

■ There can be no doubt that this Case was properly commenced and administered pursuant to § 303(b)(4) of the Code. As noted above, Congress explicitly provided the foreign representative of an estate in a foreign proceeding, the option to commence a plenary bankruptcy case under § 303(b)(4) of the Code. In fact Chemical concedes that the Liquidators "without question" fit the Code's definition of a foreign representative and that "[b]eyond question, the Axona winding-up or liquidation proceeding in Hong Kong satisfies the Code definition of a foreign proceeding." *See* Chemical Brief at 18–19; *see also* 11 U.S.C. §§ 101(22), (23). Accordingly, the existence of property of the Debtor in this country is sufficient to invoke this

Court's jurisdiction under § 303(b)(4). *See* 28 U.S.C. § 1334(d), 157(a), Standing Order of Referral. The Debtor's bank accounts in this country constitute that jurisdictional predicate for the commencement of this Case. *See generally In re Berthoud,* 231 Fed. 529 (S.D.N.Y.1916) (jurisdiction in that case rested on the alleged bankrupt's bank account located in New York City, even though he did not have his principal place of business, nor did he reside, nor have his domicile within the U.S.). In language equally relevant to the instant matter the court in *Berthoud* stated:

> Under section 2 of the act residence or domicile or the locus of the principal place of business is immaterial if there is property within the United States and the statute confers jurisdiction even in the case of those who have been adjudged bankrupts by courts of competent jurisdiction without the United States, provided that such persons have property within the jurisdiction of the United States.

> In many other provisions of the statute the word "property" will be found; and it is apparent that Congress intended that the United States courts should deal with and administer the estates of bankrupts if property existed and was found within our borders. Starting with this premise, it logically follows that Congress did not mean to exclude from the operation of the act those persons who are aliens, whether living here or abroad, who have property within the United States.

*Id.* at 532.

Although the *Berthoud* case refers to Section 2 of the "Act," its rationale has been extended to the Code. *See Bank of America, N.T. & S.A. v. World of English, N.V.,* 23 B.R. 1015, 1019–20, 1022–23 (N.D. Ga.1982) (cases construing the meaning of the Requirements of § 2(a) of the Act will be "useful" in any analysis of 11 U.S.C. 109 which addresses eligibility of a party to be a debtor under Title 11).[24] Thus, there is a

---

24. Although § 109(a) has been construed to address the issue of eligibility to qualify as a debtor under Title 11 as opposed to the issue of

subject matter jurisdiction, *see e.g. Promenade National Bank v. Phillips (In re Phillips),* 844 F.2d 230, 235 n. 2 (5th Cir.1988), the following

sufficient predicate for subject matter jurisdiction over the § 303(b)(4) case provided by the presence of Axona's bank account, as well as other property interests, in the United States at the time the § 303(b)(4) petition was filed.

To the extent that Chemical seeks to read a supplemental set of requirements into the statute, there is absolutely no basis for doing so. As noted in the previous section addressing Chemical's statutory challenge, the Joint Applicants have satisfied each of the elements of the relevant statutes.

## C. The Constitutional Challenges

### 1. Equal Protection

In the alternative, Chemical contends that the Axona Bankruptcy Case should nonetheless be dismissed pursuant to § 707 of the Code and Local Rule 15. Specifically it alleges that the application of the Code's avoiding powers against Chemical, combined with the Trustee's invocation of § 304 of the Code (as incorporated by § 305), deprives it of "its rights and immunities under the Fifth Amendment of the Constitution of the United States, to the equal protection of the laws of the United States." (Chemical Brief at 3). According to Chemical, the violation results from the Hong Kong Liquidators' intentional and unilateral election not to use the bankruptcy or equivalent laws of Hong Kong to invalidate what Chemical alleges were Hong Kong transactions. (*But see* n. 11 *supra*). Chemical contends that the Liquidators invoked this Court's jurisdiction in order to avail themselves of United States Bankruptcy Law, which Chemical views as being more favorable to the Liquidators and Trustee than Hong Kong law. (*See* n. 12 and discussion at 610–11 *supra*). The injustices perceived by Chemical are: (a)

that it has not been granted a reciprocal opportunity to make such an election of applicable law; and (b) that although United States bankruptcy laws governing recovery of preferences and setoffs were invoked against Chemical, those same laws were not applied to recover the proceeds of similar transactions from Hong Kong citizens.[25]

■ The first prong of Chemical's argument—that its constitutional right as a United States citizen to the equal protection of the laws of the United States is violated because unlike the Liquidators it is being "deprived of the ability to elect to have *foreign law* applied to justify its conduct"—is on its face, an argument bereft of logic.

While the Fifth Amendment does not contain explicit language parallel to the Fourteenth Amendment in respect to equal protection of the laws, it is clear that the concepts of equal protection and due process both stem from the American idea of fairness, and although not interchangeable, they are also not mutually exclusive. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). "Although the Fifth Amendment does not contain an equal protection clause as does the Fourteenth, discrimination may be so unjustifiable as to violate due process." *Wright v. Altus Production Credit Assoc.*, 468 F.2d 997, 997–99 (10th Cir.1972).

The right to equal protection mandates that the government provide uniform treatment to all similarly situated persons or groups within its jurisdiction. *See Kentucky Finance Corp. v. Paramount Auto Exchange Corp.*, 262 U.S. 544, 43 S.Ct. 636, 67 L.Ed. 1112 (1923); *Desris v. City of Kenosha*, 687 F.2d 1117, 1119 (7th Cir. 1982), *cert. denied*, 462 U.S. 1120, 103 S.Ct.

authorities, discussed above, provide the requisite statutory underpinnings supporting a finding of subject matter jurisdiction, *see* 28 U.S.C. § 1334(d), 157(a), Standing Order of Referral.

**25.** It should be noted at the outset of this discussion that the proceeds from the disputed transaction were turned over to the Trustee and Joint Liquidators, by Chemical, pursuant to a *consensual settlement agreement* which was so ordered

by this Court. (*See supra* discussion at 602). That turnover order did *not* result from a decision on the merits. Accordingly this Court questions the propriety of Chemical's starting premise, that the turnover was the result of the application by this Court of unconstitutional provisions of the Bankruptcy Code. Nonetheless, for the sake of completeness, this Court will address this argument raised by Chemical.

3090, 77 L.Ed.2d 1350 (1983). The requirement of equal treatment however, does not mean that the government may never draw lines in the creation and application of laws that treat one class of individuals or entities differently. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1972), *reh'g denied*, 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 200 (1973). To the extent that persons who are similarly situated are being subject to disparate treatment, that discrimination must have a rational justification, where statutes involving economic matters are involved. *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973); *see also Kentucky Finance Corp.*, 262 U.S. at 551, 43 S.Ct. at 639.

Accordingly, the threshold issue is whether persons who are similarly situated are being subject to disparate treatment. *See Johnson v. Smith*, 696 F.2d 1334, 1336 (11th Cir.1983). To the extent that Chemical is basing its objection on the fact that under the Code it is not treated identically to the Liquidators, this Court must point out that Chemical is not "similarly situated" to either the Liquidators or the Trustee and therefore, Chemical's claim does not represent an equal protection violation.

The second prong of Chemical's argument is that it is being prejudiced vis-a-vis Axona's other creditors. This unfairness perceived by Chemical similarly does not rise to the level of a Constitutional violation. This is because all similarly situated creditors in this Case (i.e. the Attaching Creditors) have been similarly subject to United States bankruptcy law. Indeed, every person subject to the personal jurisdiction of this Court is also subject to the provisions of the Bankruptcy Code. Accordingly the purported unconstitutional inequality alleged by Chemical is in fact illusory.

### 2. *Due Process*

█ Chemical also alleges that the Trustee's recovery from it, of the proceeds from the disputed transaction, qualifies as a "taking" violative of the Fifth Amendment of the United States Constitution ("Fifth Amendment"). This argument is also meritless.

The Constitution grants Congress the broad power "[t]o establish ... uniform Laws on the subject of Bankruptcy throughout the United States." U.S. Const. Art I, § 8, cl. 4. While this Constitutional grant has been construed to permit the retrospective impairment of contractual obligations, it must be exercised in accordance with the Fifth Amendment prohibition against taking private property without just compensation. *United States v. Security Industrial Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 410, 74 L.Ed.2d 235 (1982) (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935)).

In *Security Industrial Bank*, the only case cited by Chemical to support its Due Process challenge, the Supreme Court held that the *retroactive* application of § 522(f)(2) of the Code, to avoid liens acquired by secured creditors *before* the Code's enactment date, constituted an unconstitutional taking. 459 U.S. at 82, 103 S.Ct. at 414. A comparable issue was similarly resolved by the Supreme Court in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854. Nonetheless, the court in *Security Industrial Bank*, made it clear that strictly *prospective* application of the statute at issue is constitutional. *Security Industrial Bank*, 459 U.S. at 78–82, 103 S.Ct. at 412–15.

It is hardly a novel concept that, pursuant to its constitutional bankruptcy power, the federal government has the ability to compromise the rights of creditors. The Court in *Shanghai Power Co. v. United States* described the Bankruptcy Code as an apt example of what was *not* a taking. The Court stated:

> The filing of ... a [bankruptcy] petition has a profound effect upon the rights of creditors. Payments made and liens obtained within a specified time before filing can be set aside or recovered as preferences; the right to pursue self-help remedies is abrogated; debts are dis-

charged with the creditor generally allotted a small fraction of the amount due and sometimes nothing. *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 246 (1983), *aff'd*, 765 F.2d 159 (Fed.Cir.), *cert. denied*, 479 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). The Court emphasized that, in light of the important policy considerations identified by Congress in mandating the orderly liquidation of liabilities through the Bankruptcy Code "a creditor cannot argue that bankruptcy proceedings are unlawful because he could have collected more had he been permitted to pursue other remedies." *Id.*, (citing *In re 1030 North Dearborn Building Corp.*, 9 F.Supp. 972, 974 (E.D.Ill. 1935)).

Nonetheless, this is just the argument Chemical is proffering in support of its Cross–Application. The facts of the instant proceeding are clearly distinguishable from those underlying *Security Industrial Bank* and *Radford*. This matter does not involve a pre-existing lien grant agreement and a subsequent amendment to the Bankruptcy Code, followed by an attempt to apply the amendment to undermine the pre-existing lien rights. Instead, the disputed Axona transaction occurred subsequent to the effective date of the relevant Code sections. Accordingly, where "the rules of the game are established so that creditors are able to factor them into their business decisions, there can be no question of a taking." *Shanghai Power Co.*, 4 Cl.Ct. at 247.

Chemical however claims that in dealing with Axona, a foreign debtor, it could not "reasonably and rationally expect the bankruptcy laws of the United States to apply to the affairs of the foreign debtor conducted within the United States." (Chemical Brief at 55–56). This claim is baseless. Chemical is first and foremost a New York bank doing business in New York. Its

relevant transactions with Axona were conducted in U.S. dollars, largely through a longstanding New York account and relationship of Axona with Chemical. Chemical undeniably involved its New York office in the November 1982 restructuring.

Based on the foregoing, it is abundantly clear that Chemical must be presumed to have been on notice that it would or could be subject to United States law applicable to its conduct even when it is acting in the international context. Therefore Chemical cannot successfully assert that it had no reason to expect that United States law would apply to its conduct. For these reasons Chemical's allegation of an unconstitutional taking must fail.

### 3. § 305(c)—Non-reviewability

Chemical's final contention is that it is unconstitutional for this Court to enter a suspension order under § 305(a) of the Code. In support of this position Chemical cites § 305(c) of the Code which states in relevant part: "[a]n order under subsection (a) of this section ... suspending all proceedings in a case, or a decision not so to ... suspend, is not reviewable by appeal or otherwise." 11 U.S.C. § 305(c). Chemical contends that this Court, as an Article I Court, may not make any order in a bankruptcy case which is not reviewable. As a result Chemical argues that this precludes entry by this Court of a suspension order under § 305(a).

This Court concurs with the persuasive authority in support of the proposition that an order entered pursuant to § 305(a) is properly an unreviewable exercise of discretion on the part of the Bankruptcy Court, even when the review sought is based upon jurisdictional or statutory grounds. *See In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 555–56 (7th Cir.) *cert. denied*, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985)[26]; *Cinema Service*

26. The court in *In re Cash Currency* stated:
  [T]he district court addressed the Director's argument that the bankruptcy court should have abstained, concluding that review of an abstention order is proper 'where, as here, the appeal raises a jurisdictional issue.' *In re Cash Currency Exchange, Inc.*, 37 B.R. at 629

n. 12. This court has found the statutory prohibition of appellate review of abstention decisions to be "clear and therefore conclusive." *In re Covey*, 650 F.2d 877, 880 (7th Cir.1981). No exceptions to the prohibition [of § 305(c) ] were provided by Congress. Even if this court were to sanction the judicial

*Corp. v. Edbee Corp.*, 774 F.2d 584, 585 n. 1 (3d Cir.1985); *In re Nexus Communications, Inc.*, 55 B.R. 596, 597 (Bankr.E.D.N. C.1985); *contra Pankau v. First State Bank of Harvard (In re Pankau)*, 65 B.R. 204, 206 (Bankr.N.D.Ill.1986).

Nonetheless, the narrower § 305(c) issue of whether a suspension order is reviewable on Constitutional grounds, is one which this Court, as the core trial court, need not resolve. Instead, Chemical has the option of raising this Constitutional issue at the appellate level where it may appropriately be addressed. *See e.g., Farmer v. First Virginia Bank of Fairfax County, Va.*, 22 B.R. 488, 490–91 (D.C.E.D.Va.1982).[27]

### V. CONCLUSION

On the basis of the foregoing analysis, this Court denies Chemical's cross-motion for an order dismissing the case, vacating *ab initio* all proceedings and settlements therein and restoring all settlement funds recovered by the Joint Applicants. This Court grants the relief requested in the Joint Application. The case and proceedings hereunder are suspended, and assets shall be turned over pursuant to the following terms:

(1) All administrative expenses as defined in Section 507(a) of the Bankruptcy Code incurred in connection with this case, as allowed by this Court, shall be paid by the Trustee out of the assets of this estate.

(2) All other allowed claims filed in this case entitled to priority under Section 507(b) of the Bankruptcy Code, if any, shall be paid by the Trustee out of the assets of this estate.

(3) The Trustee shall retain the sum of $500,000 to complete the administration of this estate.

(4) Upon receipt by this Court, with proof of service by hand upon Weil, Gotsh-al & Manges, attorneys for American Express Bank Ltd., Manufacturers Hanover Trust Company and State Street Bank International, of a letter from the Liquidators stating: (i) that the funds transferred pursuant to this Order, and a substantial portion of the funds on hand in Hong Kong, will be distributed within 72 hours after receipt in Hong Kong of the funds transferred pursuant to this Order; and (ii) that the Banks will participate in the distribution in accordance with their respective proofs of debt, as submitted in the Hong Kong winding-up proceeding of Axona in accordance with the Stipulations and Orders of Settlement entered into by the Banks, the Trustee and the Liquidators, and their respective United States Counsel, and approved by this Court, the balance of all funds of this estate after payment of the items listed in paragraphs (1) and (2) above and after making provision for the Trustee to retain the sum of $500,000 as set forth in paragraph (3) above, shall be transferred to the Liquidators for administration in Hong Kong winding-up proceeding.

(5) Upon the transfer, the Liquidators shall make distribution of the funds transferred and of a substantial portion of the funds on hand in Hong Kong to all creditors of Axona within 72 hours of their receipt of the funds transferred.

(6) Prior to any distribution by the Liquidators pursuant to subparagraph (5) above, the Trustee shall provide the Liquidators with a complete list of the proofs of claim filed by creditors in this case (the "United States Claim List"), setting forth the full name and address of each such creditor, the amount of each such creditor's claim and the classification of the claim. The Liquidators shall compare the United States Claim List with the list maintained by the Liquidators of the claims filed by

creation of exceptions to this rule, which we do not, the one created by the district court must fail. *Id.* 762 F.2d at 555.

**27.** In *Farmer* rather than holding that the Bankruptcy Court was not permitted to enter an order under § 305(a), the District Court assumed jurisdiction of an appeal, based upon due process grounds, of a Bankruptcy Court's § 305(a) order. *Id.* Although the Court held that § 305(c) "is unconstitutional to the extent that it attempts to bar review of constitutional issues," it remedied the problem by deciding to "read a proviso into this section permitting appeals based on constitutional grounds." *Id.* at 490 and n. 2.

creditors in the Hong Kong winding-up proceeding and promptly notify in writing each creditor who filed a proof of claim in this case but who has not heretofore filed a proof of debt in the Hong Kong winding-up proceeding, of each such creditor's right to file a proof of debt in the Hong Kong winding-up proceeding, explaining the procedure for filing a proof of debt in the Hong Kong winding-up proceeding, enclosing a copy of the statutory forms for the filing of a proof of debt in the Hong Kong winding-up proceeding and advising each such creditor that failure to file a proof of debt in the Hong Kong winding-up proceeding within the time specified in the notice will preclude each such creditor's opportunity to share in the distribution pursuant to subparagraph (5) above. Any proofs of debt filed in the Hong Kong winding-up proceeding of Axona pursuant to this subparagraph (6), like all other proofs of debt filed in the Hong Kong winding-up proceeding, shall be administered in accordance with the provisions of Hong Kong law.

(7) The Trustee shall continue to administer all remaining aspects of this case and this Court shall retain jurisdiction for such purposes.

(8) The Trustee shall file a final report and final account pursuant to Section 704(9) of the Bankruptcy Code as expeditiously as possible. Upon approval by this Court of such final report and account, any surplus funds and assets remaining in the United States estate of Axona shall be transferred to the Liquidators for administration in the Hong Kong winding-up proceeding of Axona.

IT IS SO ORDERED.